Martin NELSON, et al.

v.

Richard THORNBURGH, et al.

Civ. A. No. 81–5115.

United States District Court,
E.D. Pennsylvania.

July 12, 1983.

Andrew F. Erba, Community Legal Services, Philadelphia, Pa., for plaintiff.

Stephen F. Gold, Philadelphia, Pa., for plaintiff-intervenor.

Maura A. Johnston, Deputy Atty. Gen., Harrisburg, Pa., for defendants.

## OPINION

LOUIS H. POLLAK, District Judge.

Plaintiffs Martin Nelson, Paula Buntele and Thomas Mobley are income maintenance workers ("IMWs") employed by the Department of Public Welfare ("DPW") of the Commonwealth of Pennsylvania, and assigned to neighborhood offices of the Philadelphia County Board of Assistance ("PCBA"). Defendants, all sued in their official capacities, are Governor Richard Thornburgh, Secretary of Welfare Helen O'Bannon and PCBA Executive Director Dan Jose Stovall.[1]

Plaintiffs are blind. Because their job entails extensive paperwork, they are unable to perform their duties satisfactorily without the aid of a reader. Plaintiffs have therefore hired readers on a part-time basis. With the assistance of these readers, plaintiffs meet the requirements of their position as well as their sighted colleagues.

Plaintiffs, up to now, have borne the expense of these readers, despite requests by plaintiffs and the Office of Civil Rights of the Department of Health and Human Services that DPW assume this cost. Plain-

---

1. The Commonwealth, initially named as a party defendant, was dismissed on sovereign immunity grounds in an Order entered on September 13, 1982.

tiffs claim in this lawsuit that DPW's refusal to accommodate them by providing readers or, in the alternative, mechanical devices capable of helping them accomplish the reading functions, constitutes "discrimination" within the meaning of section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, which provides in relevant part:

> No otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. . . .

Plaintiffs seek declaratory and injunctive relief, as well as damages for reader expenditures made in the past.

Defendants contend that plaintiffs are not "otherwise qualified" within the meaning of section 504 because they do not possess an essential qualification of the IMW position: the ability to read. Alternatively, defendants argue that, even if "otherwise qualified," plaintiffs are not entitled to the accommodation that they seek because the cost of readers or mechanical devices would be an undue hardship on DPW and PCBA. Finally, defendants insist that, even if they are found obligated to assume the cost of accommodating plaintiffs' blindness in the future, this court is without authority to require defendants to reimburse plaintiffs for reader expenses incurred heretofore.

The issues in this case have been fully developed through plaintiffs' unsuccessful motion for a preliminary injunction, defendants' partially successful motion for summary judgment, supplemental memoranda on the issue of damages, and a four-day trial. On the basis of the evidence presented, I make the following:

## FINDINGS OF FACT

### I. *The Parties*

Plaintiffs Martin Nelson, Paula Buntele and Thomas Mobley, all blind since birth, are employed by DPW as IMWs. Each is assigned to a different district of the PCBA. Defendants Thornburgh, O'Bannon and Stovall have ultimate responsibility for the policies and practices complained of in this lawsuit.

DPW is a department of the Commonwealth of Pennsylvania, charged with administering the federal and state programs, such as cash assistance, food stamps and medical assistance, designed to aid those in need. *See* 62 Pa.Stat.Ann. § 401. In the fiscal year which ended on June 30, 1983, DPW was authorized to disburse $4,310,-000,000; of this sum, a little under half came from the federal government through block grants. An additional $300,000,000 is devoted to administering the funds, $141,-000,000 of which is contributed by the federal government. Eighty percent (80%) of the administrative budget is used to pay salary and benefits for DPW's 38,000 employees.[2]

Since 1979, budgetary constraints have considerably reduced the work-force of the county assistance offices, including the offices in Philadelphia County administered by the PCBA. For instance, 160 clerical employees have been furloughed in Philadelphia County, and a hiring freeze has been in effect since 1979. During that same period, caseloads have increased by about 100,000 cases statewide, with a proportional increase in Philadelphia. This combination of diminished resources and enlarged responsibilities has resulted in a growing backlog of work in many offices, increasing the strain on clerical, caseworker and supervisory employees.

### II. *The Functions of the IMW*

The IMW is, as a rule, the only point of contact between the individual recipient and the massive apparatus of the state and federal welfare system. Historically, the focus of the IMW's responsibilities was on social work: accompanying the provision of material aid with counselling and referrals

---

**2.** 8,900 of the Department's employees work in county assistance offices scattered across the state. 3200 of these employees work in Philadelphia County.

to other helping agencies (e.g., vocational training programs). The caseworker, as the IMW used to be known, interviewed the client, sometimes in a home visit, and then described in a narrative the results of the interview and the reasons for granting or denying aid.

By the mid-1970's the nature of the job had shifted away from traditional social work. The central function of the job is now the determination of the client's initial and continued eligibility for federal and state benefits. The practice of reporting the outcome of the interview through a narrative recital is a casualty of this trend; it has been almost fully replaced by computerized standard forms. The standard forms are designed to maximize efficient processing of benefits and minimize mistakes by making it easier to control the IMWs' discretion and keep the client files uniform.

The principal form used by the IMW in the interview with the client is the "743," part of the "121 series" adopted by DPW in the mid-1970's. The IMW elicits from the client all the information required by the five-page form, which includes everything relating to the client's financial, vocational and family situation that could conceivably bear upon the question of eligibility.[3] DPW's normal procedure calls for the IMW to copy this information by hand on the appropriate block of the 743 form. Depending on the client's situation, the IMW may also have to fill out other forms, such as a food stamp application worksheet or a child support form. During the interview, the IMW often will have to review documents provided by the client. Some documents, such as rent receipts, are used to verify the client's address; others, such as medical reports, are used to evaluate the client's

medical fitness for work, an important component of the eligibility requirement.

After a form is completed, the IMW hands it to the client for review. If the information is correct, the client signs the form. The typical IMW spends about half the day conducting interviews.

After the client leaves the office, the IMW makes the determination of eligibility for benefits. To do this, the IMW consults the DPW Income Maintenance Manual ("the Manual"). The Manual is over one thousand pages long, and filled with regulations, procedures, charts and tables. New materials are added to the Manual almost daily, reflecting changes in the amount of aid or the policies affecting its distribution.[4] From the standards contained in the Manual, the IMW determines if the information on the 743 entitles the client to receive or continue to receive benefits.[5] Some of the benefits are distributed under federal programs, such as Aid to Families with Dependent Children, Old Age Assistance, and foodstamps. Other benefits exist under state programs, like General and Medical Assistance.

After determining eligibility under these programs, the IMW fills out an instruction sheet encoding the decision on the amount of benefits, and sends it with the 743 to the clerical department. The clerical staff then enters all the data into the central computer.

The IMW must then perform the post-interview procedures, which include completing forms in order to update client information, sending copies of forms to appropriate offices and personnel and notifying the client of DPW's decision on his or her eligibility.

Another important function of the IMW is attending to "special projects." Special

3. These interviews now generally take place in the district office, as DPW is attempting to phase out home interviews whenever possible.

4. The IMWs attend frequent training sessions at which they learn about changes in the Manual.

5. For redeterminations of eligibility, required to take place every six months for each client, the

IMW follows the same basic procedures as in the initial determination of eligibility. Prior to the redetermination interview, however, the IMW must take the added step of reviewing the case file in search of factors, such as the possibility of new income sources, that may affect eligibility.

projects are undertaken at the direction of higher level administrators and are designed to correct errors that may have escaped scrutiny in individual cases. For example, the IMW may receive a list of his or her clients who receive Social Security benefits as well as assistance, to determine whether that income source was disclosed at the time of the eligibility decision. Or, the IMW may receive a list of clients receiving more than the maximum grant or less than the minimum, and be asked to justify or rectify the discrepancy.

The IMW must also be prepared to handle client emergencies by being able to calm distraught clients, replace lost checks, or track down bureaucratic error.

Changes in the last ten years have operated to limit the range of discretion associated with the IMW position. Yet the IMW remains a professional-level position, with significant responsibilities. The capacity to read without aid is certainly helpful in carrying out the duties of the job, as are the abilities to hear or to move about without help. The essential qualifications for this career, however, are dedication to the work, sufficient judgment and life-experience to enable one accurately to assess the legitimate needs of clients, and the ability to work effectively under the pressure of competing demands from clients and supervisors.

### III. *The Blind IMW*

#### A. *The Plaintiffs' Experiences*

With the aid of readers, plaintiffs perform their job as well as sighted IMWs. By employing readers on a part-time basis, plaintiffs have earned fully satisfactory evaluations from their supervisors.

The experience of plaintiff Martin Nelson as a blind IMW is typical of the other plaintiffs, with relevant differences noted in footnotes. Mr. Nelson came to work for DPW in 1970,[6] and has employed a reader on a part-time basis since that time. As long as records were being kept in narrative form, Mr. Nelson's need for a reader was limited, for the narratives were dictated into a machine and then transcribed by the typing pool. With the advent of the standardized form, demanding meticulous attention to detail, Mr. Nelson's use of a reader increased dramatically. He currently uses his reader an average of 32.5 hours per week.

Mr. Nelson pays his reader $3.80 per hour, spending approximately $480 per month for reader salary, or about $5,100 per year. Mr. Nelson earns $21,379 in salary, plus fringe benefits of about $4,000.[7] Plaintiffs are able to afford a reader on their salary because they receive $316 per month in Supplemental Security Income (SSI). They receive SSI benefits to help defray work-related expenses that result from their blindness. That portion of the reader expenses not covered by SSI is paid out of salary, and is tax deductible. Were the SSI benefits to cease, plaintiffs would be unable to employ readers.

When conducting a client interview, Mr. Nelson uses his reader to fill out the forms according to his instructions and to read aloud any documents the client may have brought in. Mr. Nelson takes notes of the interview in braille, with a slate and stylus.[8] After the form is completed, Mr. Nelson confirms that the information given is accurately inscribed, and then has the client sign the form. Mr. Nelson later has his reader review specific sections of the Manual in order to determine eligibility. The reader also helps Mr. Nelson carry out the special projects.

When the reader is not there, Mr. Nelson

---

**6.** Mobley began work in 1975, Buntele in 1972.

**7.** Mr. Mobley, who also earns $21,379 per year, employs two part-time readers, costing him $1,000–$1,200 per year. Ms. Buntele earns $22,804 per year, and employs a reader five hours per day, at a cost of $100 per week.

**8.** A slate is a small sheet of hinged metal inscribed with a series of dots, corresponding to the braille alphabet. After inserting paper into the slate, a piercing tool known as a stylus is used to punch the raised dots onto the paper and thus encode information.

reviews his file of brailled client cards.[9] But, as Mr. Nelson testified, after he has organized his work, "there are times when time lies rather heavily on my hands," and all there is left to do is "read two or three articles of National Geographic." N.T. 133–34.

Ms. Buntele follows a procedure similar to Mr. Nelson's and, like Mr. Nelson, experiences periods of inactivity when the reader is not present. On the other hand, Mr. Mobley, by varying the routine slightly, has been able to reduce significantly both his demand for a reader and his idle time. Mr. Mobley schedules his interviews with clients for the afternoons. Like Mr. Nelson, he takes notes on a slate and stylus. But Mr. Mobley's reader is not present during interviews.[10] His reader works mornings, helping Mr. Mobley to fill in the 743 and the instruction sheet for the previous day's interviews. The client returns sometime during that day, or soon thereafter, to verify and sign the completed form. By following this procedure, Mr. Mobley needs a reader for only four hours per day.

### B. The Demand for Readers and DPW's Response

As DPW's increased use of standardized forms spawned the plaintiffs' increased use of readers, each plaintiff separately requested that DPW assume the reader expenses. When informal attempts to reach a settlement on the issue proved futile, Nelson filed a complaint in July 1980 with the Office of Civil Rights (OCR) of the Department of Health and Human Services. Buntele filed a similar complaint a few months later. On investigating these complaints, OCR concluded that DPW was not in compliance with section 504's implementing regulations because it was not providing the complainants and other blind IMWs with sufficient accommodation. OCR requested

that DPW reimburse blind employees for past and current reader expenses pending creation of a civil service position of reader. DPW refused to comply and efforts at reaching a negotiated settlement failed.

In October or November, 1981, plaintiffs met with representatives of the PCBA to discuss possible accommodations. Plaintiffs requested that DPW either provide them with readers, or restructure the IMW position to reduce the need for readers by, for example, brailling the Manual, forms and training material, or by allowing the IMWs to type or dictate client information. Marie DeLuca, Deputy Executive Director of PCBA, directed a study of the feasibility of plaintiffs' requests. She determined that providing readers or brailling the Manual would be prohibitively expensive, and that modifying the standard form would impede accuracy and efficiency. She did not consult any rehabilitative experts before reaching her decision.[11]

PCBA has taken some steps to accommodate plaintiffs. For example, they are supplied with braille paper, and supervisors seem to make a special effort to review their work. During training sessions, supervisors spend extra time instructing plaintiffs on changes in the Manual or procedures to be followed on a special project. Mr. Nelson is supplied with a typewriter, and he was given some special consideration when caseloads were redistributed. These accommodations, though helpful, are insufficient to allow plaintiffs to perform the essential functions of their job without readers.

### C. Types of Accommodation

Three expert witnesses testified concerning the methods and costs of accommodating the plaintiffs to enable them to perform

---

**9.** The card contains the name, address, and last and next date of redetermination.

**10.** Mr. Mobley's testimony did not address how he examines documentary evidence. That problem is presumably handled by asking co-workers for help, by copying the documents, or by retaining the documents until the reader comes in the next day.

**11.** Ms. DeLuca's decision not to provide readers for the plaintiffs was endorsed by Secretary O'Bannon. The essence of the Secretary's position is that it is wasteful to have "two people doing one person's work." Trial deposition of O'Bannon at 22.

the essential functions of their job. John Halverson and Patrick Camorato testified on behalf of plaintiffs; Frederick Noesner testified on behalf of defendants. All three are blind and all three presented impressive credentials in the field of work-place accommodations for the blind.

The experts' testimony, in sum, suggested four types of accommodation DPW could pursue:

(1) The first may more accurately be called an "alternative technique" than an accommodation, N.T. 87, for it involves relatively costless adjustments in the agency's procedures. One such technique would be to braille the forms to make them easier for a blind IMW to follow and explain to a reader. Another such technique would be to allow blind IMWs to require clients to return the next day to sign the face sheet of the 743, enabling the IMWs to conduct interviews without the presence of a reader, as Mr. Mobley already does.

(2) A second type of accommodation would be to print the thousand-page manual in braille. The cost of brailling fifty copies of the Manual—enough for blind IMWs throughout the state—would be approximately $34,000.

(3) A third type of accommodation is technological: DPW could purchase one of a number of kinds of new machines that combine microchip technology and braille. The most promising of these inventions is the Versabraille. The Versabraille is a portable [12] mini-computer that uses a standard cassette to store and retrieve information in braille.

Versabraille information is organized by chapters, pages and paragraphs. The blind IMW could use the Versabraille to encode all the information gathered from a client interview by plugging in the name of the client as the chapter, and the specific infor-

mation—say eligibility for foodstamps—as a page. The blind IMW could later "read back" the information by recalling the name of the client and "foodstamps," and touching the display. The display is the "readout" on the Versabraille. Dots raised on the plastic display represent twenty braille characters at one time. For the next twenty characters the blind IMW would merely press the advance bar.

The Versabraille, if linked with a printer, also has the capability of transcribing from the braille into the English alphabet. This feature could enable the IMW to arrange the information received during the interview into the order required by a standard form, and print out that information directly onto the form.

Additionally, it is quite possible that the Versabraille could be linked to the existing DPW computer system. This would allow the IMW to enter information directly into, or take information from, the DPW data base. When the Manual is computerized, the Versabraille could encode it into paperless braille.[13]

Each Versabraille would cost at most $7,000, plus $700 for a printer. A maintenance contract would cost another $700 per year. Because they already know braille, the plaintiffs in this case could learn to use Versabraille in two or three days.[14]

The Versabraille would substantially reduce the need for a reader but it would not eliminate it entirely. Handwritten documents would still require reading, as would mail and material not produced by or entered into the DPW computer.

(4) The fourth type of accommodation is providing a reader.

### D. *The Cost of Reasonable Accommodation*

Of the four types of accommodation referred to above, the provision of readers is

---

**12.** The Versabraille measures $14'' \times 9'' \times 5''$, and weighs 11 pounds.

**13.** The Versabraille has been used with success by the Social Security Administration, the Internal Revenue Service, and Bell of Pennsylvania.

**14.** Other devices of recent invention are equally ingenious, though less well suited to meet these plaintiffs' needs. One is an Opticon, which can scan typewritten material and convert it to braille. There is also a voice computer able to read and pronounce, although imperfectly, typewritten script. These machines, however, are not portable and have no memory.

required to enable a blind IMW to perform the essential functions of the position. But a full-time reader is not required, because it is not necessary to have a reader in attendance while determination and redetermination interviews are being conducted. Those interviews consume approximately half of a working day. If the PCBA were to permit each blind IMW to function as Mr. Mobley does, a blind IMW could gather client information one day and, on the following day, use the reader to prepare the form, with client verification on that day or soon thereafter. By using this method a blind IMW could perform the essential functions of the job by using a reader four hours a day or less. During the rest of the day, a person capable of serving as a reader should be "on call" on an emergency basis.

Assigning a clerical worker already in the office to double as a reader would seem the most sensible method of accommodation. That clerk/reader could spend approximately half the day attending to reading duties. During the other half of the day, the clerk/reader could perform clerical tasks, but be available to serve as a reader whenever truly necessary.

The Clerk Typist I—the basic clerical position within the DPW—earns $13,276 per year. Since plaintiffs could perform the essential functions of their position if DPW supplied each of them with a half-time reader, the cost of accommodation would be approximately half the salary of a Clerk Typist I, or roughly $6,638 per year for each plaintiff.

Adoption of the first two types of accommodations—changing agency procedures and brailling the Manual—could enhance the efficiency and productivity of readers, and thus lower the cost of accommodation. Investment in the third type of accommodation—new technology and most particularly the Versabraille—could also be expected to lower the cost of accommodation by signifi-

cantly reducing the blind IMW's dependence on the availability of readers. None of these accommodations, however, would eliminate entirely the need for readers.

Assuming accommodation is found to be required as a matter of law, it will be up to defendants to determine whether readers alone would be utilized or whether use would also be made of one or more of the other types of accommodation. If defendants were to employ other accommodations in addition to readers, the governing principle would be that the aggregate remedial package would, as to each plaintiff, be as effective as providing each of the plaintiffs with (a) daily access to a reader for half of the working day, and (b) emergency access to a reader as required during the other half of the working day.

## DISCUSSION

Three issues are raised by plaintiffs' claims.[15] The first is whether plaintiffs are "otherwise qualified" within the meaning of section 504. If they are, next to be decided would be whether the accommodation required to enable plaintiffs to perform the essential functions of their job—half-time readers or their equivalent—would be reasonable, or whether it would instead impose an undue hardship on DPW and the PCBA. Finally, if that accommodation is reasonable, the question would be raised whether plaintiffs are entitled to damages for past reader expenditures, or are instead barred from recovering by one of a number of statutory and constitutional doctrines.

### I. *Otherwise Qualified*

Section 504 prohibits only "otherwise qualified" individuals from being discriminated against by reason of handicap. Plaintiffs contend that they are "otherwise qualified" because, with accommodation, they are able to perform all the job functions associated with the IMW position.

---

**15.** Two issues yet to be decided by the Supreme Court have been resolved in the Third Circuit. The first is that section 504 creates a private right of action, *NAACP v. Wilmington Medical Center,* 599 F.2d 1247 (3rd Cir.1979). The second is that this right of action exists whether or not the primary purpose of the federal assistance is to provide employment. *LeStrange v. Consolidated Rail Corp.,* 687 F.2d 767 (3rd Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 1181, 75 L.Ed.2d 429 (1983).

Defendants respond by arguing the following syllogism: plaintiffs are "otherwise qualified" only if they possess all the abilities necessary to perform their job; that one of the most important abilities for the IMW to possess is the ability to read; that plaintiffs cannot read; and therefore that plaintiffs are not "otherwise qualified."

The legislative history of the Rehabilitation Act does not explain the Congressional intent in choosing the phrase "otherwise qualified." However, the Supreme Court, in *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), has closely examined the meaning of the phrase. *Davis*, a unanimous opinion, remains the only directly relevant Supreme Court decision. It therefore provides an appropriate starting place for analysis of the issues posed in the present controversy.

### A. *Davis*

Francis Davis suffered from a hearing disorder. By wearing a hearing aid, she was able to detect the presence of sounds almost as well as a person with normal hearing, but still had trouble locating the source of the sounds or discriminating among them sufficiently to understand spoken speech. She therefore had to rely primarily on her lipreading skills for oral communication.

Ms. Davis hoped to be trained as a registered nurse. To achieve that ambition, she enrolled during the 1973–74 academic year in Southeastern Community College's Parallel Program: a program designed to fulfill the prerequisites for the College's Associate Degree Nursing Program. Upon completing the Parallel Program, however, Ms. Davis was refused entry into the nursing program. The decision, made after considerable deliberation, was based on plaintiff's handicap.

Ms. Davis brought suit under section 504. The district court, after a hearing, analyzed her claim first by defining "otherwise qualified" in this context to mean "otherwise able to function sufficiently in the position sought in spite of the handicap, if proper training and facilities are suitable and available." 424 F.Supp. 1341, 1345 (E.D.N.C.1976). The court then found that Ms. Davis would pose a potential danger as a student or registered nurse because a patient or doctor might be unable to secure her attention and be quickly understood in a medical emergency. Because Ms. Davis could not under certain circumstances perform her functions safely, she could not perform them sufficiently. Therefore, she was not "otherwise qualified," and judgment was entered for the defendant.

The Court of Appeals for the Fourth Circuit reversed. Relying upon its interpretation of regulations newly promulgated by the Department of Health and Human Services (then, the Department of Health, Education and Welfare), the Fourth Circuit held that "otherwise qualified" meant qualified "without regard" to handicap. The case was ordered remanded to the district court to consider whether Ms. Davis met all the other criteria for admission. If she did, the college must accept her, modifying its program in whatever ways were necessary in order to accommodate her handicap. 574 F.2d 1158, 1160–62 (1978).

The Supreme Court, speaking through Justice Powell, reversed. After reviewing the proceedings and opinions below, and examining the language of the statute and the implementing regulations, the Court endorsed the district court's view of the meaning of "otherwise qualified": "An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." 442 U.S. at 406, 99 S.Ct. at 2367. Because plaintiff could not meet these requirements, she was not "otherwise qualified."

Justice Powell's opinion then went on to consider whether the nursing program requirements might be modified to accommodate Ms. Davis. The Court first noted that even the most radical alteration in the program would avail Ms. Davis little, for while the paramount concern for patient safety demanded that Ms. Davis be closely supervised in her practical training, such supervision would frustrate the program's goal of encouraging the assumption of responsibili-

ty. Moreover, the Court found that section 504 requires no "affirmative action"—that is, no modifications "in existing programs beyond those necessary to eliminate discrimination against otherwise qualified individuals." *Id.* at 410, 99 S.Ct. at 2369. The Court then acknowledged the fineness of the line it was drawing "between a lawful refusal to extend affirmative action and illegal discrimination against handicapped persons." *Id.* at 412, 99 S.Ct. at 2370. The Court explained:

> It is possible to envision situations where an insistence on continuing past requirements and practices might arbitrarily deprive genuinely qualified handicapped persons of the opportunity to participate in a covered program. Technological advances can be expected to enhance opportunities to rehabilitate the handicapped or otherwise to qualify them for some useful employment. Such advances also may enable attainment of these goals without imposing undue financial and administrative burdens upon a State. Thus, situations may arise where a refusal to modify an existing program might become unreasonable and discriminatory.

*Id.* The Court then charged the Department of Health and Human Services with the "important responsibility" of "[i]dentification of those instances where a refusal to accommodate the needs of a disabled person amounts to discrimination against the handicapped." *Id.* at 413, 99 S.Ct. at 2370.

### B. *Applying Davis*

A useful framework for evaluating a handicap discrimination claim after *Davis* is advanced in a student note, *Accommodating the Handicapped: The Meaning of Discrimination under Section 504 of the Rehabilitation Act,* 55 N.Y.U.L.Rev. 881 (1980) (*Accommodating the Handicapped*). The analysis, adopted by the Fifth Circuit in *Prewitt v. United States Postal Service,* 662 F.2d 292, 305 (1981),[16] points out that the handicapped face four types of barriers to equality in the employment area. Two types of barriers—social bias and disparate impact from neutral standards[17]—are common to any member of a disfavored group. Two other types of barriers, however, are unique to the handicapped, for these barriers result from the nature of the handicap in combination with the requirements of the position in question. One type is "surmountable impairment barriers," referring to barriers to job performance that can be fully overcome by accommodation. The other is "insurmountable employment barriers," where the handicap itself prevents the individual from fulfilling the essential requirements of the position.

*Davis* presents an example of an insurmountable employment barrier, because the ability to hear is an essential requirement for a nurse in order to insure patient safety. Thus *Davis* at least stands for the proposition that an individual facing an insurmountable barrier is not "otherwise qualified" within the meaning of section 504.[18]

---

**16.** Both *Accommodating the Handicapped* and *Prewitt* rely in part on two other scholarly pieces: Gittler, *Fair Employment and the Handicapped: A Legal Perspective,* 27 De Paul L.Rev. 953 (1978) and Note, *Accommodating the Handicapped: Rehabilitating Section 504 after Southeastern,* 80 Colum.L.Rev. 171 (1980).

**17.** An example of a neutral-standards barrier is a rule against allowing dogs into a federal courthouse, which would operate to impair a blind lawyer relying on a seeing-eye dog. *See also Majors v. Housing Authority,* 652 F.2d 454 (5th Cir.1981) (housing project may have to permit exception to "no pet" rule for woman with acute psychological dependency on her dog).

**18.** Two recent cases in this court have relied on this strand of *Davis* in ruling that plaintiffs do not fit within the definition of "otherwise qualified." In *Strathie v. Department of Transportation,* 547 F.Supp. 1367 (E.D.Pa.1982), Judge Ditter ruled that a hearing-impaired school bus driver was not otherwise qualified within the meaning of the Act, because his inability to localize sounds meant that he could not perform two necessary functions of his position: insuring control over and safety for the riders. *Id.* at 1381. In *Bey v. Bolger,* 540 F.Supp. 910 (E.D.Pa.1982), Judge Bechtle held that plaintiff, who suffered from uncontrolled hypertension and cardio-vascular disease, could not safely perform even light duties with the Postal Service without endangering his health and safety. *Id.* at 926.

*Davis* also teaches that an individual facing a surmountable employment barrier is not "otherwise qualified" if accommodation would require a substantial modification in the requirements of the position, or would result in an undue administrative or financial burden upon the federally assisted program sought to be charged pursuant to section 504. The Court characterized accommodations which it considered excessive as "affirmative action." 442 U.S. at 410, 412, 99 S.Ct. at 2369, 2370.

There is no claim in the present case that accommodation of these plaintiffs would entail substantial modifications of the requirements of the position, or impose a new administrative burden on DPW. The claim is simply that the accommodation called for would cost too much. Thus, the arguments over "otherwise qualified," "reasonable accommodation," "undue burden" and "affirmative action" all collapse into one issue: would the cost of providing half-time readers be greater than the Act demands?

## II. *Reasonable Accommodation/Undue Burden*

### A. *The Administrative Regulations*

■ *Davis* describes the parameters in which a solution to the problem must be found, but does not resolve it. To advance the inquiry whether unwillingness to accommodate amounts to discrimination, *Davis* instructs that the administrative regulations implementing section 504 should be examined. Administrative regulations, if consistent with the purposes of the statute, are entitled to judicial deference. *Davis,* 442 U.S. at 411, 99 S.Ct. at 2369. And they deserve particular deference where, as here, the proper resolution of the case cannot be deduced by logical process from the words

of the statute, but must instead represent a quantitative judgment: a quasi-legislative compromise between competing interests.

■ The HHS regulations that bear on the issue in this case are the product of an extended rule-making process carried out in 1976 and 1977.[19] Now codified at 45 C.F.R. § 84.1 *et seq.* (1982), these regulations reflect a conscious effort at balancing the needs of the handicapped with the budgetary realities of programs receiving federal funds.

The regulations define a "qualified handicapped person" as one who "with reasonable accommodation, can perform the essential functions of the job in question." *Id.* at § 84.3(k)(1). As examples of reasonable accommodations, the regulations include: "job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, *the provision of readers* or interpreters, and other similar actions." *Id.* at § 84.12(b)(2) (emphasis added).

The recipient must make such accommodations unless it "can demonstrate that the accommodation would impose an undue hardship on the operation of its program." *Id.* at § 84.12(a). The regulations do not spell out precisely how that showing can be made, but they do list the following "factors to be considered" in the determination of undue hardship:

(1) The overall size of the recipient's program with respect to number of employees, number and type of facilities, and size of budget;

(2) The type of the recipient's operation, including the composition and structure of the recipient's workforce; and

---

**19.** After the District Court for the District of Columbia ordered that regulations be promulgated, *Cherry v. Mathews,* 419 F.Supp. 922 (D.D.C.1976), the Secretary, in May of 1976, published a Notice of Intent to Issue Proposed Rules, with a draft of those rules enclosed. 41 Fed.Reg. 20,296 (1976). More than 300 written comments were received in response. In addition, a series of ten meetings were conducted at various locations across the country. *See* 42 Fed.Reg. 22,676 (1977).

In July of 1976, the Secretary issued a Notice of Proposed Rulemaking, with proposed regulations, revised in light of the comments received. 41 Fed.Reg. 29,548 (1976). Another 850 comments were received, supplemented by 22 public meetings. After assessment of all this information, the final regulations were promulgated on May 4, 1977. 42 Fed.Reg. at 22,676–77.

(3) The nature and cost of the accommodation needed.

*Id.* at § 84.12(c)(1–3). In addition, Appendix A to the regulations illustrates how these factors should be applied in determining whether the recipient of federal funds has discharged the burden of showing undue hardship:

> The weight given to each of these factors in making the determination as to whether an accommodation constitutes undue hardship will vary depending on the facts of a particular situation. *Thus, a small day-care center might not be required to expend more than a nominal sum, such as that necessary to equip a telephone for use by a secretary with impaired hearing, but a large school district might be required to make available a teacher's aide to a blind applicant for a teaching job. Further, it might be considered reasonable to require a state welfare agency to accommodate a deaf employee by providing an interpreter while it would constitute an undue hardship to impose that requirement on a provider of foster home care services.*

Appendix A—Analysis of Final Regulations, 45 C.F.R. § 84 at 300 (emphasis added).

Applying the regulations to the facts of this case reveals that the answer called for by the regulations is clear. "[T]he provision of readers" is an express HHS example of reasonable accommodation. Moreover, in view of DPW's $300,000,000 administrative budget,[20] the modest cost of providing half-time readers, and the ease of adopting that accommodation without any disruption of DPW's services, it is apparent that DPW has not met its burden of showing undue hardship. To be sure, DPW's financial resources are limited. But there is no principled way of distinguishing DPW on this basis from the large school district employing an aide for a blind teacher, or from the state welfare agency providing an interpreter for a deaf employee.[21]

For all these reasons, accommodation must be provided unless these regulations "constitute an unauthorized extension of the obligations imposed" by section 504. *Davis*, 442 U.S. at 410, 99 S.Ct. at 2369. To that question we now turn.

### B. Congressional Intent

Nothing in the legislative history of section 504 suggests that regulations requiring reader accommodation should be considered beyond the scope of the statute. While the 1973 Rehabilitation Act is silent on the subject of monetary expenditures,[22] the 1978 amendments to the Act[23] strongly suggest that Congress was well aware that compliance with Section 504 could be costly, and that Congress was prepared to underwrite a part of that price. Section 115(a) of the 1978 Amendments calls for grants to states to establish and operate comprehensive rehabilitation centers. Part of the mandate of these centers is to provide "to local governmental units ... such information and technical assistance (*including support personnel such as interpreters for the deaf*) as may be necessary to assist those entities in complying with this chapter, particularly the requirements of section 794 [section 504]." 29 U.S.C. § 775(a)(2) (emphasis added).

That Congress expressed no disapproval of the regulations defining reasonable accommodation and undue burden, which

---

**20.** DPW allocates $600,000 for travel reimbursement for County employees alone. O'Bannon at 41.

**21.** The United States has filed an amicus brief in support of interpreting these regulations to require accommodation of these plaintiffs.

**22.** As one court has noted, "this may be more the result of Congressional inattention to the costs of implementing the policy of nondiscrimination announced in section 504 than a Congressional determination that such expenditures would not be necessary to effectuate that policy." *American Public Transp. Assoc. v. Goldschmidt*, 485 F.Supp. 811, 826 (D.D.C. 1980).

**23.** The Rehabilitation Act of 1973 was substantially amended by the Rehabilitation, Comprehensive Services, and Development Disabilities Amendments of 1978, Pub.L. No. 95–602, 92 Stat. 2955 (codified in scattered sections of 29, 32 and 42 U.S.C.).

were promulgated prior to the 1978 amendments, may also be regarded as evidence that Congress understood that combating discrimination against the handicapped would cost money. *Cf. Bob Jones University v. United States,* —— U.S. ——, ——, 103 S.Ct. 2017, 2032–34, 76 L.Ed.2d 157 (1983) (Congressional failure to modify well-known administrative regulations may be viewed as Congressional endorsement of agency's interpretation of statute).

## C. *The Case Law*

Cases interpreting section 504 have uniformly recognized that preventing discrimination against the handicapped may mean that recipients of federal funds will have to expend funds of their own. The *Davis* Court recognized that "on occasion the elimination of discrimination might involve some costs." 442 U.S. at 411 n. 10, 99 S.Ct. at 2369 n. 10. While the Third Circuit has not directly addressed the issues posed in this litigation,[24] cases from other Circuits support the conclusion reached here.

A recent example of such a case in the field of transportation is *Dopico v. Goldschmidt,* 687 F.2d 644 (2d Cir.1982). In *Dopico,* plaintiff, representing a class of wheelchair-bound handicapped persons, sued the New York City transportation system seeking to make the system accessible to them. Judge Weinfeld had dismissed the claim for failure to state a cause of action, because, under *Davis,* the plaintiffs were not entitled to the "massive relief" they were seeking under section 504. 518 F.Supp. 1161, 1175 (S.D.N.Y.1981). The Second Circuit, speaking through Judge Newman, reversed, pointing out that even if plaintiffs could not prevail in their attempt to overhaul the entire transportation system of the city, they still may be entitled to some relief

under section 504: "We believe that section 504 does require at least 'modest, affirmative steps' to accommodate the handicapped in public transportation. Every court that has considered the question has concluded as much." 687 F.2d at 652 (*quoting American Public Transit Assoc. v. Lewis,* 655 F.2d 1272, 1278 (D.C.Cir.1981)). In remanding the case, Judge Newman called upon the lower court to give weight to the regulations implementing section 504. *See also United Handicapped Federation v. Andre,* 558 F.2d 413 (8th Cir.1977); *Lloyd v. Regional Transp. Auth.,* 548 F.2d 1277 (7th Cir.1977).

The Fifth and Tenth Circuits have also interpreted *Davis* as requiring that states spend money to bring about reasonable accommodation. In *Camenisch v. University of Texas,* 616 F.2d 127 (1980), the Fifth Circuit affirmed an order requiring the University of Texas to procure and compensate an interpreter to assist a deaf graduate student in his classes. Although the Supreme Court vacated the opinion as moot without reaching the merits of the section 504 issue, 451 U.S. 390 (1981), the panel's reasoning was endorsed in subsequent Fifth Circuit opinions: *Majors v. Housing Authority,* 652 F.2d 454 (1981), *Tatro v. Texas,* 625 F.2d 557 (1980) (*Tatro I*) and *Tatro v. Texas,* 703 F.2d 823 (1983) (*Tatro II*).[25] In *New Mexico Ass'n for Retarded Citizens v. New Mexico,* 678 F.2d 847 (10th Cir.1982), the Tenth Circuit held that section 504 may require the state to modify its educational system to accommodate its retarded schoolchildren by providing them with, *inter alia,* occupational, physical and speech therapy services. The case was remanded to the district court to consider whether the financial burden of such accommodation would

---

**24.** *Gurmankin v. Costanzo,* 556 F.2d 184 (3rd Cir.1977), *cert. denied,* 450 U.S. 923, 101 S.Ct. 1375, 67 L.Ed.2d 352 (1981), affirmed the lower court's ruling that the School District of Philadelphia discriminated against a blind teacher when it refused to award her seniority status dating from the time she first attempted to secure a teaching position and was denied appointment because of her handicap. The Court of Appeals relied on an "irrebuttable presumption" analysis rather than section 504, because

the Rehabilitation Act had not been passed at the time the discrimination took place. *See id.* at 188. It bears noting, however, that the teacher would require a full-time teacher's aide.

**25.** In *Tatro II,* a panel of the Fifth Circuit upheld the district court's order requiring the school district to accommodate a schoolchild who had to be catheterized several times daily.

be "excessive" under the guidelines set forth in *Davis*.

### D. *Conclusion*

I conclude that accommodating plaintiffs to enable them to perform the essential functions of their position is consistent with the mandates of section 504 and with the administrative regulations and case law interpreting it. I am not unmindful of the very real budgetary constraints under which the DPW and PCBA operate, and recognize that accommodation of these plaintiffs will impose some further dollar burden upon an already overtaxed system of delivery of welfare benefits. But the additional dollar burden is a minute fraction of the DPW/PCBA personnel budgets. Moreover, in enacting section 504, Congress recognized that failure to accommodate handicapped individuals also imposes real costs upon American society and the American economy. But for the fortuitous availability of supplemental benefits from the federal government—benefits which heretofore have enabled plaintiffs to hire and pay readers on their own—these plaintiffs, despite their education, experience and commitment, would have been barred by their handicap from the position of IMW, where they now serve as examples of how handicaps can be overcome. When one considers the social costs which would flow from the exclusion of persons such as plaintiffs from the pursuit of their profession, the modest cost of accommodation—a cost which seems likely to diminish, as technology advances and proliferates—seems, by comparison, quite small.[26]

### III. *Damages*

The decision to grant injunctive relief raises the question whether plaintiffs are also entitled to damages for past reader expenditures. That question has two subparts. Does section 504 create a private cause of action for damages? If so, is the recovery of damages against an agency of the state nevertheless barred by the Eleventh Amendment to the United States Constitution?

### A. *Damages under Section 504*

The touchstone of deciding whether a statute creates a private right of action is legislative intent. *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15–16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979). With near unanimity, the courts have inferred from the legislative scheme Congress's intent to create a private right of action under section 504. Unfortunately, there is no legislative history instructive on the extent of the remedy Congress intended to make available to a private plaintiff in a section 504 action. In the absence of legislative guidance, the courts have split on the issue of whether the remedy is limited to injunctive relief or also includes a right to collect damages.

The courts holding that no damage remedy for violations of section 504 was intended by Congress view the legislative plan as relying primarily on governmental enforcement of the rights of the handicapped, with the ultimate remedy of cutting off federal funds to recipients engaging in discrimination. Further, it is argued that implying a damage remedy which could reach massive proportions might discourage the acceptance of federal funds, working against the goal of expanded workplace opportunities for the handicapped. *Ruth Anne M. v. Alvin Independent School District*, 532 F.Supp. 460, 473 (S.D.Tex.1982); *Boxall v. Sequoia Union High School*, 464 F.Supp. 1104 (N.D.Cal.1979).

Cases deciding that private plaintiffs may collect damages reason that the availability of a damage remedy increases the deterrent effect of the non-discrimination law. The

---

**26.** It is worth noting in this connection that DPW considers employable, and thus ineligible for benefits, handicapped applicants for public assistance who are "fully employable with reasonable accommodation." Reasonable accommodation for this purpose is defined as "structural modifications, modified work schedules, acquisition or modification of equipment or de-vices, *provision of readers or interpreters*, job restructuring and other similar actions." N.T. 195; Ex. P–35 (emphasis added). It does not seem wholly unfair to impose upon DPW the same requirements that DPW apparently imposes upon its clients and their would-be employers.

opinions also rely on the seminal case of *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), for the proposition that where a federal right has been invaded, the courts are normally empowered to use any available remedy to make good the wrong done. *Id.* at 684, 66 S.Ct. at 776. Assuming Congressional awareness of this principle, these cases interpret the lack of legislative discussion as tacit acceptance of the presumption "that a wrong must find a remedy." *Miener v. Missouri,* 673 F.2d 969, 978 (8th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982); *Hutchings v. Erie Library Bd. of Directors,* 516 F.Supp. 1265, 1268–69 (W.D.Pa.1981); *Patton v. Dumpson,* 498 F.Supp. 933, 939 (S.D. N.Y.1980); *Poole v. South Plainfield Bd. of Ed.,* 490 F.Supp. 948 (D.N.J.1980).

I am persuaded by the perception of the legislative scheme and the reasoning put forward in the second group of cases. The Supreme Court has stated that "[t]he existence of a statutory right implies the existence of all necessary and appropriate remedies." *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 239, 90 S.Ct. 400, 405, 24 L.Ed.2d 386 (1969). Congress certainly has the power to limit remedies if it so chooses. In the absence of any indication that Congress intended to exercise that power to create a limited remedial scheme for section 504, it is a fair canon of statutory interpretation to indulge the presumption that Congress intended that the full panoply of remedies be available to the private plaintiff under section 504.

### B.  *The Eleventh Amendment*

■ Mere presumptions and canons of statutory construction will not, however, suffice to overcome the Eleventh Amendment. That Amendment normally operates to bar the recovery of damages in an action if judgment would be collected against the state, even where, as here, the state is not named as a party. *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974) (§ 1983 does not abrogate Eleventh Amendment).

■ Plaintiffs do not dispute that a recovery of damages against the named defendants in reality would come from the state. Their primary argument is that Congress has acted to abrogate the Eleventh Amendment when it passed section 504.[27] There is no doubt that Eleventh Amendment protections may be overridden when Congress acts within its grant of plenary power under section 5 of the 14th Amendment. *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (Attorney's Fees Awards Act abrogates Eleventh Amendment); *Fitzpatrick v. Bitzer,* 427 U.S. 445, 447, 96 S.Ct. 2666, 2667, 49 L.Ed.2d 614 (1976). (Title VII of the 1964 Civil Rights Act abrogates Eleventh Amendment). Assuming *arguendo* that section 5 is the source of section 504,[28] respect for the constitutional status of the principle of state sovereignty embodied in the Eleventh Amendment requires at least persuasive legislative history that Congress intended to abrogate the Amendment. Here, the legislative silence does not speak louder than the words of the Eleventh Amendment, and plaintiff's claim for damages must fall. *Miener v. Missouri,* 673 F.2d at 982.

### CONCLUSIONS OF LAW

In light of the preceding findings of fact and discussion, I conclude that:

**27.** Plaintiffs also characterize their request for relief as equitable rather than compensatory. But no matter how labelled, any payment ordered would represent a remedy for a *past* violation of section 504. Retrospective relief is not available against a state, unless the Eleventh Amendment has been abrogated. *Edelman,* 415 U.S. at 668–669, 94 S.Ct. at 1358; *Quern v. Jordan,* 440 U.S. 332, 338, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979).

**28.** Defendants contend that section 504 was passed pursuant to Congress's spending power, because it reaches only recipients of federal funds. While Congress may abrogate the Eleventh Amendment by conditioning the receipt of federal funds on a state's surrender of Eleventh Amendment immunities, it must do so expressly. *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981); *Employees v. Dep't of Health and Welfare,* 411 U.S. 279, 285, 93 S.Ct. 1614, 1618, 36 L.Ed.2d 251 (1973). If Congress were viewed as acting under its spending power in passing section 504, the clear statement of intent to waive the Eleventh Amendment required of Congress would be lacking.

(1) This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343;

(2) Plaintiffs are "otherwise qualified" within the meaning of section 504 of the Rehabilitation Act, 29 U.S.C. § 794;

(3) Defendants, acting in their official capacity, have discriminated against plaintiffs by refusing to provide them with half-time readers or their mechanical equivalent;

(4) Plaintiffs are barred· from recovering damages by the Eleventh Amendment.

An appropriate order follows.[29]

### ORDER

For the reasons recited in the accompanying Opinion, it is hereby ORDERED that:

(1) Judgment is entered for the plaintiffs and against the defendants;

(2) The parties, within thirty (30) days of the date of this Order, shall submit a form of order outlining a remedy not inconsistent with this opinion;

(3) Defendants, within ten (10) days of the date of this Order, shall declare whether they continue to oppose class certification, and, if so, submit a memorandum explaining why class certification should not be ordered. A responsive memorandum, if necessary, shall be filed within ten (10) days thereafter, and argument, if necessary, shall follow promptly.

---

**29.** Thomas Mobley intervened as a plaintiff purporting to represent a class of similarly situated blind IMWs. The motion for class certification was opposed by defendants, and disposition of the motion was deferred pending this opinion. In the accompanying order, I will direct defendants either to stipulate to the applicability of this opinion to the class or to show cause why class certification should not issue.