Jerry HENRY, Plaintiff,

v.

UNIFIED SCHOOL DISTRICT
# 503, Defendant.

No. 02–1142–JTM.

United States District Court,
D. Kansas.

July 29, 2004.

**1132**

David P. Calvert, Dwight A. Corrin, Wichita, KS, for Plaintiff.

Susan P. Selvidge, Fleeson, Gooing, Coulson & Kitch, L.L.C., Wichita, KS, for Defendant.

## MEMORANDUM AND ORDER

MARTEN, District Judge.

This matter comes before the court on the Unified School District # 503's (defendant) motion for summary judgment (Dkt. No. 47) in this employment discrimination case. Jerry Henry (plaintiff) alleges defendant violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq. and the Kansas Act Against Discrimination (KAAD), 44 K.S.A. § 44–1001, et seq. Plaintiff also brings a claim of tortious interference with a business relationship.[1] The motion is fully briefed and ripe for disposition. For the reasons stated below, the court grants the defendant's motion for summary judgment. Accordingly, the court dismisses the claims against defendant.

---

1. In particular, plaintiff alleges defendant discriminated against plaintiff with respect to his employment contrary to § 12112(a) (count I); defendant retaliated against plaintiff contrary to § 12203(a) (count II); defendant tortiously interfered with his business relationship with Labette County Community College (count III); defendant violated the KAAD (count IV).

## I. Statement of Facts

Plaintiff, an industrial arts (auto mechanics and welding) teacher, is sixty years old. He has taught at U.S.D. # 503 for 19 years, from 1971–73, and from 1986 to present. Previously, plaintiff's contract included duties as department chairman, Vocational Industrial Clubs of America (VICA) sponsor, and a seventh hour which gave him an increment of 1/7 of his regular contract. Plaintiff was one of the highest paid teachers in the district.

Plaintiff has a bachelors degree in industrial technology and a bachelors degree in education. He also has a masters degree in education. Since earning his masters degree, plaintiff earned an additional 45 hours of college credit in education.

Plaintiff, hearing impaired since birth, wore hearing aids as a child. However, plaintiff stopped wearing hearing aids until he reached his twenties. At that point, he started wearing a low-power hearing aid. Plaintiff has worn hearing aids during his entire 19–year teaching career with defendant. At the beginning of his teaching career, plaintiff only wore one low-power hearing aid. About fifteen years ago, due to deteriorating hearing, plaintiff started wearing two hearing aids. Over the years, plaintiff's hearing continued to deteriorate and the power of his hearing aids continually increased. Plaintiff's hearing loss is permanent and it is getting progressively worse. Plaintiff's physician told him there is no surgery that will correct his hearing loss or prevent it from getting worse.

Plaintiff is married to Annetta Henry. She assists him greatly with his hearing loss. She is aware of the circumstances under which he cannot hear and tries to make sure that he is aware of the situation. Plaintiff converses with others using his hearing aids. However, even with his hearing aids plaintiff is not able to communicate normally. His ability to converse depends on many factors beyond his control such as the amount, intensity and volume of background noise, the acoustics in the room in which the conversation is taking place, whether the person with whom he is conversing is facing plaintiff, speaking clearly, not slurring words, or mumbling.

Plaintiff's hearing loss interferes with his daily life as well as his teaching. As his hearing deteriorates, plaintiff has more trouble hearing on the telephone. He can hear some people with little difficulty, if the environment at both ends of the phone is quiet. Other people are more difficult for him to hear. Plaintiff has trouble visiting with his grandchildren on the phone because they are young and their voices are soft. Plaintiff generally uses amplified telephones. He seldom answers the phone at home if Annetta Henry is there. She handles many of their business calls because of his hearing loss. Plaintiff is able to carry on telephone conversations without amplified telephones in quiet environments, because his hearing aids amplify the voice of the other person on the line. The other person must speak clearly, distinctly, and in a normal voice.

Plaintiff has trouble hearing in ordinary situations in life. Although he is able to compensate for some of them, there are many occasions where he simply pretends to hear or figure out what was said from the partial conversations he hears. In a social settings, it is difficult for plaintiff because of background noises. Plaintiff hears the loudest sound in the room. He tends not to participate in group conversations lest what he says turn out to be an inappropriate comment. Plaintiff cannot talk with people outside in the wind because the wind drowns out people's voices through his hearing aid. One of plaintiff's hearing aids makes a screeching sound occasionally, but he cannot hear it. Plaintiff hesitates to go to some gatherings

because of this possibility. When watching television, plaintiff uses earphones that operate the volume separately. Otherwise, the volume must be so high that it is uncomfortable for other persons in the room.

Plaintiff has trouble hearing at movies, school plays, and church. Amplified speech creates some type of conflict with plaintiff's hearing aids and he is generally unable to understand the entirety of the speaker's statements. He is usually able to get the meaning by a combination of hearing bits and pieces and figuring out the rest. Although plaintiff is an elder at his church, he does not attend elders' meetings. The elders are seated at a large table and he can only hear the person sitting next to him.

When the batteries in his hearing aids go dead, plaintiff generally excuses himself to change them. Removing them causes loud whistling noises until they can be properly seated in his ears. At school, he has to change them in the classroom in the presence of the students because he cannot leave students alone. This is embarrassing because the students laugh and cover their ears. If plaintiff's hearing aids are sent in for repair, the loaners are never as powerful. He is in a precarious position until the hearing aids are returned.

At school, plaintiff recently went to a vocational meeting in the library. Plaintiff was straining to hear the meeting. However, when the air conditioner in the ceiling came on behind him, he couldn't hear. In the past, he asked co-workers to take notes for him. Plaintiff was late to a faculty meeting because he did not hear the announcement on the intercom. The principal found him and told him he was a half hour late to the meeting. Plaintiff does not hear a lot of the intercom messages because the voices come through distorted. Sometimes the students pass the messages on, but most of the time they do not. He has to call the office to get the message. If he is in the shop with all the shop noises, he doesn't hear them at all. Plaintiff hears the loud beep from the intercom but not the message. Amplified mechanical sound causes distortion.

In performing his job as a welding instructor, plaintiff often needs to talk on the phone, hear announcements from the office over the intercom, communicate with students as a group, and communicate with students one on one. When plaintiff uses the amplified telephone in the noisy atmosphere of the welding shop, his hearing aid usually makes a loud whistle. The whistle occurs because the aids are so powerful that putting the phone against the aid causes feedback.

Plaintiff does not read lips, use sign language or communicate by writing notes. Plaintiff explains at the beginning of each class at the first of the new school year that without his hearing aids he is almost completely deaf. He tells the students to speak up and face him if they want to communicate with him. Although some students cooperate, most do not. The students laugh if plaintiff answers one of their questions in a way that is not related to the question.

Plaintiff taught industrial arts classes for U.S.D. # 503 without any accommodation through 2000. Prior to 2000, plaintiff taught auto mechanics and welding at the junior high building. The junior high building was made of concrete block and brick which muffles sound. It had only four welding stations and one fan.

At times during this lawsuit, plaintiff has continued to teach industrial arts for both U.S.D. # 503 and Labette Community College (LCC), raised a few cows, and repaired automobiles at his home. The welding class plaintiff teaches for LCC has adult students who do not take advantage of his hearing loss. These college-age stu-

dents are quieter and more considerate. He teaches these classes at the high school shop, but there are no announcements during the LCC classes. Plaintiff was nominated for Adjunct Teacher of the Year at LCC in 2002. Plaintiff's hearing is not a problem in raising cows or repairing automobiles at his home, although, plaintiff sometimes depends on his hearing to diagnose a problem with a car. Since plaintiff's hearing is deteriorating, this is becoming more difficult. Plaintiff drives vehicles and his motorcycle on public roads. Plaintiff has a Kansas drivers license. There is no hearing requirement to obtain this license.

Besides teaching, plaintiff has also held many jobs including gas station attendant, mobile home assembler, welder, inert stores foreman, sales representative, lumber company employee, emissions control engineer, bulldozer operator, delivery man, mechanic, and auto dealership service manager. Plaintiff admits he is still qualified for those jobs. He could perform the jobs with reasonable accommodations. Plaintiff was rejected for the U.S. Army and Katy Railroad because of his hearing loss. In 1969, he was hired by Allstate as an insurance adjuster. Plaintiff quit after a week, because he could not hear on the phone even with a hearing aid. Allstate would not provide him with an amplified telephone. Plaintiff informed the District in his Application that he held several other types of jobs. Plaintiff did not ask for an accommodation at any job except at U.S.D. # 503.

In 2000, the District built four new Parsons High School shops, including a welding shop. Plaintiff was involved in the design of the welding shop. The new high school welding shop has a classroom space separated from the welding shop, with a glass window between the classroom and shop. The window allows plaintiff to observe students in the noisy shop, while he is working with one or more students in the quiet of the classroom. The old junior high welding shop and classroom area were in shared space with the woodworking shop with plaintiff's classes exposed to welding and woodworking shop noises. The new welding shop and classroom are not open to the woodworking shop. The new building is steel which echoes sound. It has 18 exhaust fans running: air exchanger blowing overhead (6 fans); 18 welders running at different times; 2 floor fans running (both fans 42″ in diameter); pedestal grinder; air grinders; hand-held grinders running throughout the day.

School policy requires teachers to provide the names of students who are failing to the guidance office. The guidance office is responsible for counseling those students or motivating them to improve their grades. On or about December 22, 2000, Principal Carter was provided with a list plaintiff made of students who were failing plaintiff's welding and auto classes. Plaintiff provided the list to the guidance office in accordance with standard procedure. Eleven welding students and three automotive students' names were on the list. Although plaintiff was concerned about the students who were failing, he did not believe that the number was unusually high. Carter, who has known plaintiff since 1999, and Assistant Principal Ted Hill, who has known plaintiff since 1986, met and discussed the list on or about December 22, 2000.

Hill prepared plaintiff's February 10, 2000 Evaluation. Plaintiff received marks of "Needs Improvement" in two areas: "Maintains effective classroom management and control" and "Interacts positively and effectively with students." Hill believed plaintiff could improve his teaching performance and adequately maintain effective classroom management and control, and interact positively and effectively with

students, by teaching using hearing aids just as he had done for many years. However, plaintiff has increasing difficulty maintaining effective classroom management and control. He believes this is because his hearing is deteriorating.

In the December 22, 2000 meeting, Carter discussed the list of failing students prepared by plaintiff. He expressed concerns about plaintiff leaving his welding classes unattended by an adult, students not being required to do assignments, students getting little instruction from plaintiff, plaintiff using second and third year students to teach, and many student discipline problems.[2] Carter wanted plaintiff to prepare and submit lesson plans to address those problems as part of a Plan of Assistance. Carter's comments were objective comments based on plaintiff's concerns with the number of students failing his classes, and observed performance problems. The comments were not related to plaintiff's hearing impairment or use of hearing aids. In the December 22, 2000 meeting, Carter told plaintiff they would work together on a Plan of Assistance after the winter break.

Before coming to U.S.D. # 503, Carter was a principal in Minneapolis, Kansas. Carter used a Plan of Assistance for teacher performance problems in Minneapolis. Plaintiff is the only teacher Carter placed on a Plan of Assistance at U.S.D. # 503.

In the December 22, 2000 meeting with Carter and Hill, plaintiff expressed concerns with increasing health problems with his heart and hearing. Plaintiff said he was having stress and chest pains and complained that his hearing problems were causing problems with his classes. Carter asked plaintiff if he had looked into disability benefits. Carter, Hill and plaintiff were all aware that former Parsons High School teacher Linda Potter had recently started receiving disability benefits. Potter, whose room was near plaintiff's started on disability on December 6, 2000. Plaintiff called Linda Potter after the meeting and asked her about applying for disability benefits. She advised him to talk to Alice Caldwell (now Banzet) at the District office and told him he would need statements from his doctors.

Prior to plaintiff's meeting with Carter and Hill, December 7, 2000, plaintiff visited Dr. Thinakkal about his hearing. Plaintiff could not hear anything in his right ear and there was some discomfort in his right ear; his hearing aid was whistling more than normal. Dr. Thinakkal wrote in his notes: "The problem is that his hearing is so poor and his amplification is so high that there is even very minimal debris in the canal." His assessment was that plaintiff had chronic external otitis and severe mixed hearing loss. On the same day, December 7, 2000, plaintiff saw his family doctor, Dr. Earl Cornell, for anxiety and chest pain, and the Doctor's notes say that plaintiff spoke with Dr. Cornell about possibly applying for disability from his current occupation as a teacher. Dr. Cornell's followup note, which appears to be dated December 8, 2000 reads in part, "I talked to Dr. Thinakkal. He agrees patient has disability based on his hearing from his current occupation and would support that contention." The note also states, "I told him that he certainly

---

**2.** It is uncontroverted that these topics were covered at the December 22 meeting. It remains at issue whether plaintiff left his welding classes unattended, required his students to do assignments, or used his second and third year students to teach his classes. Throughout the statement of facts, it is uncon- troverted that these topics are covered in various emails, memos and meetings. In each instance, plaintiff does not contest the accuracy of the emails, memos and meetings. He states that the allegations are incorrect. Thus, these facts remain at issue throughout the order.

may be able to qualify for that on the basis of his hearing and emotional response to stress and that he would still be able to do other types of work, but just not the type of work he's doing now."

Plaintiff saw cardiologist Dr. Joseph Galichia on December 28, 2000 for a heart catheterization and for a stress test on January 3, 2001. Plaintiff saw Dr. Cornell again on December 29, 2000. Plaintiff reported that he couldn't do his job well. Dr. Cornell's notes state in pertinent part:

[Plaintiff] is in the process of looking into disability. He can't perform his job well because of his hearing loss. He can't stand in front of a classroom and hear the students and answer questions well. He appears to be disabled from his usual line of work. He might be able to do other kinds of work. He can read, he can interact in a smaller one on one environment. He might have many other employment opportunities available, but appears to be disabled from his current line of occupation which is a teacher in a larger classroom size. Patient will be applying for disability through KPERS at work. He'll also be applying for Social Security disability. Talked to Dr. Thinakkal and he is willing to provide whatever medical information he can to support this application....

Dr. Cornell's note reads "also patient started taking alcohol, drinking wine about 3 × a week in the last few months." Plaintiff was aware that wine in moderation proved to be an effective preventative for heart disease.

Between Christmas 2000 and New Year's 2001, plaintiff visited the District Office to talk to Caldwell about disability benefits. Plaintiff told Caldwell and Assistant Superintendent Linda Proehl that he had heart problems, stress, and could not hear the students, and that his doctors would send notes to document his disability. Proehl, who has known plaintiff for

about 15 years, made contemporaneous notes of the discussion.

On January 2, 2001, plaintiff visited Caldwell again. Plaintiff told her that he needed to quit because he had been to Dr. Galichia (cardiologist), had high blood pressure, stress, and was no longer able to hear the students even with hearing aids, and that his health care providers would send notes saying that he was disabled. Caldwell observed that during their discussions plaintiff seemed stressed, exhausted, confused and unable to remember what she told him about benefits. Plaintiff was unable to understand why he could retire on $2,500 a month because it seemed too good to be true. It was after this conversation that plaintiff discovered that there was no such disability package. Caldwell made notes soon after the discussions.

On or about January 2, 2001, Caldwell prepared a chart for plaintiff showing the benefits available to him, including KPERS disability benefits. Caldwell told plaintiff he was eligible at maximum salary for disability benefits, which pay more than retirement benefits. Caldwell also told plaintiff that due to his excellent attendance record, he had accumulated enough sick leave to bridge him to disability benefits. Caldwell told plaintiff if he was going to take disability it should be done "right now." Plaintiff was confused about this and didn't understand why there was such a hurry.

On January 2, 2001, plaintiff told Superintendent John Benson, who has known plaintiff for 19 years, that he needed to resign and apply for KPERS disability benefits, and he did not want to return to his teaching duties. Plaintiff said he could not hear the students many times and two of his doctors would provide the needed information required for disability. Plaintiff also said he was having chest pains and had an appointment with cardiologist Dr.

Galichia. Benson told plaintiff he should not return to his teaching duties. Plaintiff offered to continue to work until they found someone in his place. Benson insisted plaintiff should not return to work the next day. Plaintiff did not return to his duties the next day.

Also, on January 2, 2001, plaintiff called Dr. Cornell's office again about hearing problems and "asking about disability." On the evening of January 2, 2001, Principal Carter and his wife were at a Parsons High School basketball game. At the game, plaintiff told them he retired on disability and would not be back to teach. On January 3, 2001, Carter made an announcement to high school staff about plaintiff's retirement due to health issues.

The District received a letter of resignation from plaintiff dated January 4, 2001, effective January 3, 2001, contingent on receipt of KPERS disability benefits. The letter of resignation was prepared by the District and typed on District letterhead for plaintiff's signature. Plaintiff signed and submitted the letter. Promptly after plaintiff resigned, Assistant Superintendent Proehl sought substitute teachers for plaintiff's classes, and found a replacement auto mechanics teacher by January 5, 2001. The replacement teacher had worked for the District before and his application was on file.

Plaintiff authorized Caldwell to prepare his claim form for KPERS disability benefits. Caldwell prepared plaintiff's claim form for disability benefits, which was signed by her on January 4, 2001.

After resigning, on or about January 4, 2001, plaintiff went to Benson's office to thank him for allowing him to teach the LCC classes as approved by Carter. Plaintiff asked Benson whether he could take KPERS disability benefits and continue teaching night classes for LCC and do his garage work and cow/calf operation. Benson told plaintiff he should call KPERS, but he believed disability benefits are based on the assumption that the applicant is unable to work any job. Also on January 4, 2001, plaintiff asked Caldwell about teaching at LCC while on disability. She called KPERS and they said no. Caldwell told plaintiff that the only way he could work and make any money was "under the table." Plaintiff asked her to explain and she said that under total disability plaintiff could never work anywhere again. This was the first time plaintiff understood he needed to be "totally disabled" in order to obtain KPERS disability. He went home from the meeting thinking he had been "had."

Plaintiff never claimed to be totally disabled. He only spoke with the people from the District and his doctors about being disabled from his current teaching assignment. Plaintiff has a disability but is able to work. He called KPERS and was told that there was no disability package under which he would qualify. The woman from KPERS told him that there is no disability package that is not total disability and very few people qualify for that. If the District had told plaintiff he needed to be totally disabled before he could receive KPERS disability, he would not have resigned.

On January 5, 2001, plaintiff met with Proehl and said he wanted to return to work. Proehl told him he couldn't, because they already hired someone to take his place. He was told he needed a doctor's letter to return to work, although the office seemed to be unclear about what type of documentation would be sufficient. Also on January 5, 2001, Benson told plaintiff he would need a doctor's letter to return to work.

Plaintiff wrote letters dated Sunday, January 7, 2001 and Monday, January 8, 2001, to the District withdrawing his resignation, but stating that he was on sick

leave and would provide notice from his physician when he was able to return to work; the letters were delivered to the District on Monday, January 8, 2001. However, plaintiff states the letters said he was on sick leave, because the District told him he would be placed on sick leave. Plaintiff's application for KPERS disability benefits, which was prepared for mailing on January 8, 2001, was not sent.

On January 9, 2001 plaintiff told Proehl in a phone call he wanted to return to work. Proehl's notes reflect that plaintiff said "nothing that is wrong with me that I can't teach." On January 9, 2001, Annetta Henry also had a conversation with Proehl. Proehl wanted to know what doctor would clear plaintiff for a return to work, since plaintiff's letter stated he was on sick leave. Annetta Henry reminded Proehl plaintiff offered to return to school on January 5, 2001, but Benson said that the school would require a doctor's statement. Proehl wanted to know if plaintiff was on sick leave due to his ears, heart or stress problems. Proehl stated plaintiff told them on January 2, 2001 that all of those things were causing him problems and making it difficult to return to school. Annetta Henry told Proehl she read more about KPERS disability and that she did not believe plaintiff would qualify. Proehl told Annetta Henry that the District has an issue with the danger of plaintiff's hearing putting him or the students in a compromising position. Annetta Henry advised Proehl that plaintiff passed a treadmill test on the same day he visited the District office. Annetta Henry asked Proehl if there would ever be any accommodation for hearing loss. Proehl said that was something they had never pursued but might have to do so.

The District and School Board were confronted with questions about plaintiff's ability to teach and they were concerned about the safety of District students, because plaintiff resigned claiming to be disabled due to heart problems, stress and inability to hear students even with hearing aids, followed by his claim that he was not disabled.

On January 11, 2001, Benson and Proehl met with attorney Kerry Gasper, an attorney in private practice, formerly with the Kansas Association of School Boards (KASB). Benson believes his undated notes were made while talking to Gasper about Plaintiff, and mostly recount options for the District listed by Gasper, which Benson did not like. Proehl called an attorney at the KASB and was told the District could keep plaintiff on leave pending determination of his ability to return to work. Benson also spoke to attorney Pat Baker at the KASB on or about January 11, 2001 regarding having plaintiff examined by a cardiologist, neurologist and audiologist, which she approved.

On 1–12–01 plaintiff saw Dr. Cornell again. The notes state in pertinent part: Patient has looked further into issues surrounding disability and found out his KPERS insurance doesn't really provide good disability coverage. It only provides disablement coverage; so he'd have to be totally disabled and not be able to do any kind of additional work to qualify for that insurance program; therefore he does not qualify for KPERS disablement. In the interval, however, he has been back to his hearing aid supplier and has gotten improved hearing aids and is now back at the level where he's hearing about as well as a majority of his hearing aid customers. He now has hearing that is sufficient to allow Mr. Henry to return back to his workplace; so he wants to resume that position. He needs a release from me saying that he can go back to work, because he's been on sick leave as his diminished hearing has been evaluated here and with Dr. Thinakkal. He's also

seen Dr. Galichia and had a cardiac catheterization and apparently that was negative as well, so he has no other ongoing health concerns. . . . I see no reason why he cannot return to work at this time.

On or about January 15, 2001, Superintendent Benson met with plaintiff and his wife, and conveyed the information in an agenda prepared for the meeting. Benson also presented a Memo to plaintiff which stated in part "MAJOR CONCERN IS YOUR HEALTH AND ITS AFFECT [sic] ON YOUR ABILITY TO PROVIDE SATISFACTORY TEACHING TO YOUR HIGH SCHOOL STUDENTS." . The Memo stated "if I do not receive a written response that you are requesting KPERS disability on or before March 1, 2001 Negotiated Agreement Policy 5067.01(e) will be implemented." The District's January 15, 2001 Memo informed plaintiff he must remain on sick leave until the Superintendent received doctor statements from a cardiologist, audiologist and neurologist pursuant to the District's Negotiated Agreement with teachers, Policy 5067.01(e).

Policy 5067.01(e) states: "Any employee absent due to illness may be requested to present a doctor's statement indicating the nature of the illness and the readiness of the employee to resume his duties. Such certification shall be secured at the employer's expense provided the practitioner is specified by the superintendent." 5067.01(f) also provides: "In the event of apparent physical or mental illness of an employee, the Superintendent of Schools may require an examination by a competent practitioner, specified by the superintendent. Such examination to be at the employer's expense."

Plaintiff was informed he must remain on sick leave and Benson would set up appointments for him to see several doctors. Benson would select the doctors.

Plaintiff read the January 15, 2001 Memo as attempting to persuade him to take disability because his pay was at an all-time high and threatening him with loss of job responsibilities and pay if he didn't take disability by March 1. No other teacher has been required to submit to medical examination in the past several years. Neither has any teacher informed the District that he is disabled, resigned, and then changed his mind a few days later. Other personnel with medical fitness for duty issues have been required to have medical examinations.

The January 15, 2001 Memo also informed plaintiff that the District would not renew Supplemental Contracts in 2001–2002 for an extra teaching period, Department Chair, and sponsorship, or approve the teaching of LCC classes while plaintiff was on sick leave or under a Plan of Assistance. For several years, in addition to his Teacher Contract for the normal six-hour teaching load and planning period, plaintiff had Supplemental Contracts. Since 1995, plaintiff taught an extra hour instead of having a planning period for a total of seven paid hours. Plaintiff also had Supplemental Contracts for serving as VICA sponsor and Chair of the Industrial Arts Department. Supplemental Contracts are optional, in the District's discretion, and not subject to school continuing contract law. The reason the District chose not to continue plaintiff's Supplemental Contracts was that the District wanted plaintiff to concentrate on his primary job, i.e., teaching the District's students during the regular school day. Board Policy governing Secondary Employment 5052 states: "1. Secondary employment must not interfere with the quality of work expected of the employee. . . ."

The January 15, 2001 Memo also informed plaintiff "as reviewed by Mr. Carter and Mr. Hill on Friday, December 22,

2000, a 'Plan of Assistance' will be cooperatively written to help improve your daily teaching performance." The January 15, 2001 Memo shows "Copy to: BOE Attorneys" and Superintendent Benson believes he consulted the Board's regular attorney David Markham before presenting the Memo.

In the past, plaintiff requested use of District facilities to teach LCC classes and the District approved that request. Following the withdrawal of plaintiff's permission to use the facilities, someone else was permitted to use the shop to teach LCC classes. This person was not an employee of the District.

Shortly after the January 15, 2001 meeting and Memo, the District received a letter from attorney Richard Tucker. Tucker advised he was representing plaintiff, and that plaintiff had not requested sick leave and must be allowed to return to work immediately. Tucker's letter, dated January 17, 2001, demanded resumption of plaintiff's LCC classes, and went on to state that if the District had given plaintiff unsatisfactory marks, he was advising plaintiff to cooperate with a Plan of Assistance or Plan of Improvement. Tucker also sent releases for work from Dr. Earl Cornell (plaintiff's family doctor) and Mr. Daniel Miller (plaintiff's hearing aid provider). However, the releases did not comply with the District's requirements that plaintiff be examined by a cardiologist, audiologist and neurologist.

Plaintiff had seen Dr. Cornell on January 12, 2001. Dr. Cornell's letter stated in part:

The patient uses hearing aids. There are times when his hearing is impacted by reversible conditions such as external otitis and ear wax build up that require external cleansing. At times, the concurrent conditions further negatively impact his hearing, further compromising his ability to hear speech in crowded, noisy environments.

Because of these experiences, Mr. Henry did make an effort to check into whatever disability insurance he might have available to him through his school District and discovered that the only coverage he had would be present only if he suffered a total disablement precluding him from any type of work. The patient has a hearing disability, not a disablement....

The patient has recently also undergone a cardiovascular evaluation by Dr. Galichia, who I've spoken to and have been assured that his recent cardiac catheterization showed no anatomical significant lesion. The patient has no evidence of active cardiomyopathy and from a cardiology viewpoint is also released to return to work.

Dr. Cornell's letter also stated with "improved hearing aids, the patient is now hearing at a level similar to what he has heard in the past which has been sufficient to allow him to function in the school environment."

Mr. Miller's letter sent by Tucker on January 17, 2001 stated he worked with plaintiff in the school shop and "people with normal hearing could have trouble" hearing there, and plaintiff "functions in his environment very well with hearing aids."

Benson knew that Dr. Cornell was plaintiff's family doctor and wanted more specific information from specialists. Benson understood Mr. Miller was a commercial provider of hearing aids and not a physician or audiologist. Tucker and Benson had a phone conference on January 29, 2001.

On February 1, 2001, Tucker wrote another letter demanding immediate reinstatement, and noted plaintiff should not be charged for sick leave from January 5,

2001 but paid per contract. Benson replied for the Board on February 14, 2001 that plaintiff must remain on sick leave and comply with the medical specialist examination requirements of January 15, 2001 after which the Board would make a decision. On February 20, 2001, Tucker replied stating plaintiff would go to the District's doctors, but that Tucker expected "reasonable and appropriate accommodations would be made" without requesting any specific accommodations. The District apparently ignored this request; it never offered to meet with plaintiff nor did they ask him about accommodations.

On February 27, 2001, Tucker sent a report from cardiologist Dr. Galichia stating plaintiff is "stable to return to work." Dr. Galichia's February 8, 2001 report satisfied the District that from a cardiac standpoint, plaintiff could return to work.

On March 5, 2001 plaintiff purchased one new hearing aid. On March 9, 2001 Tucker sent a letter dated February 26, 2001 from Oklahoma City otologist Dr. Hough, who has treated plaintiff since 1959 stating in part:

> The hearing has remained fairly good in the low frequencies but as years have gone by he has suffered from a gradual nerve loss in the inner ear, so that it is now necessary for him to wear hearing aids in order to hear adequately. Although Mr. Henry does have a significant hearing impairment in both ears, with the use of adequate amplification provided by hearing aids, I do not feel that he is totally disabled and would consider him adequate for teaching in his present employment at Parsons High School. I do believe that he could perform his duties adequately in his present condition.

Benson was not satisfied with Dr. Hough's report because it had no indication of recent examination of plaintiff.

On March 13, 2001, Tucker sent a report from Dr. Thinnakal regarding hearing loss stating that plaintiff can "function well" with hearing aids if the ear canals are kept clean. The report also stated, in part, "he has severe bilateral sensorineural hearing loss. He had multiple surgeries for otosclerosis in the past; however, this disease has progressed to the present extent that he has to be amplified with very powerful hearing aids."

Meanwhile Benson made inquiries with Board attorney David Markham regarding appropriate specialists and made appointments. Benson set appointment dates on March 15, 2001 for plaintiff's regular audiologist Ruth Osborne and local neurologist Dr. D. Jain. The purpose of having plaintiff see Dr. Jain was the District's concern about plaintiff's ability to remember and track information, his abrupt reversal of his resignation based on his claim of disability, and reports from staff of lack of follow through on tasks, and not getting things done at an appropriate time.

Plaintiff saw Dr. Jain on March 26, 2001 for cognitive testing. Dr. Jain reported that plaintiff's memory was within normal limits. The mini-mental state examination evaluation gave him a score of 29 out of 30 which was well within normal limits. Plaintiff's memory problem checklist was 100 % within normal limits.

Plaintiff saw audiologist Ruth Osborne for audiologic assessment on March 22, 2001. She tested plaintiff and reported on March 27, 2001 plaintiff had speech discrimination scores of 96% in the right ear and 48% in the left ear and 96% with hearing aids. When noise was introduced, the speech reception score was 84%. She reported "Mr. Henry exhibits a severe mixed hearing loss in the right ear and a mild to severe sensorineural hearing loss in the left ear." She also reported plaintiff "showed no signs of communication diffi-

culties when he was wearing his hearing aids in a quiet environment and minimal difficulty when noise was introduced." It was her opinion based on audiological tests that plaintiff "should be able to function well in his work environment." Osborne also said, "There are a variety of signaling and telecommunication devices (i.e., flashing light for telephone; amplified telephone) available at minimal cost which might be incorporated to help assure his continued success." However, Osborne did not require any accommodation for plaintiff to be able to return to work. Osborne was not asked at this time to make recommendations concerning accommodations given the specifics of plaintiff's workplace. However, she was later asked to make a recommendation concerning accommodations and recommended a classroom aide. Osborne's report was received on April 2, 2001.

A meeting was held on April 12, 2001 with the District's lawyer Markham, plaintiff's attorney Tucker, plaintiff, his wife, Proehl and Carter to discuss plaintiff's return to work. Proehl took notes of the meeting. Benson was out of town. Proehl recalls Tucker agreeing that the Board could legally remove Supplemental Contracts. Plaintiff requested payment for teaching seven hours (even if he taught fewer hours), payment for missed LCC classes, assurance of teaching LCC classes in the shop the next year, a flashing light phone, a "para" (paraprofessional), and reinstatement to the VICA and department chair duties. Proehl told plaintiff and Tucker that having a paraprofessional in one's classroom depends upon the enrollment of special education students or those on an individualized education plan (IEP).

Proehl reported on this April 12, 2001 meeting in a Confidential Memo to the Board later that same day. Proehl told the Board plaintiff's attorney advised plaintiff to accept the District's proposal

regarding hours and class assignments (six paid hours, teaching welding four hours, no automotive classes; other three periods work on improvement plan with Principal). Carter testified plaintiff and his lawyer agreed to the number of classes to be taught.

Benson wrote plaintiff on April 16, 2001 regarding plaintiff's return to work on April 18, 2001. The letter stated in pertinent part: "Your teaching assignment for the remainder of the 2000–2001 school year will be four welding classes along with time in the afternoon to cooperatively work with Mr. Carter and Mr. Hill in the development of a 'Plan of Assistance' to help your daily teaching performance." Six hours of teaching would be paid. In the April 16, 2001 letter, the District agreed to give plaintiff paid administrative leave from January 17, 2001 to April 18, 2001. In the April 16, 2001 letter, the following items from the April 12, 2001 conference were addressed: 1) the District declined to pay for 7 periods a day, unless offered and accepted in the 2001–2002 school year; 2) the District declined to pay for LCC classes not taught; 3) the District declined to approve LCC teaching while plaintiff was under a Plan of Assistance; 4) the District agreed to provide a flashing light phone; 5) the District agreed to provide paras when certain special education students were in plaintiff's class; and 6) the District declined to reinstate the VICA or Department Chair supplemental assignments for 2001–02.

Plaintiff returned to work on April 18, 2001. On April 23, 2001, plaintiff told Principal Carter in a letter he did not want a flashing light phone, rather he wanted a loud bell and amplified phone handset in the welding shop. Plaintiff also complained his personal items were being removed from the auto shop. Benson had already obtained amplified phone informa-

tion on April 19, 2001 from Sheila Simmons, a Board member employed with Assistive Technology for Kansans.

On April 25, 2001, Carter made a note that Par–Com was coming to talk to him and plaintiff about plaintiff's phone requests. In various notes, Carter also said he discussed with plaintiff: 1) why he was absent during school time when plaintiff was supposed to be working on summaries of school program visits; 2) developing a model of class discipline; 3) discipline needed for two of plaintiff's students; and 4) problems with plaintiff's personal items in the auto shop. Carter ordered the amplified phone on April 30, 2001 and also agreed to install a loud buzzer with it. The amplified phone did not come, so Carter reordered from a different company, "Hearing Planet," on or about June 14, 2001.

On May 3, 2001, Proehl visited plaintiff's welding class and found plaintiff was not present while students were welding and grinding. Proehl reported this incident by e-mail to Carter:

This morning, May 3, 2001, I was at the High School Vocational Building visiting with Shelly Haraughty. After leaving her classroom, I walked into Mr. Henry's welding class but he was not in his classroom. There were two groups of students welding, one student using a yellow machine on the west wall, one grinding near the front of the classroom and two or three students in the caged area at the front. I asked a student where Mr. Henry was and the student stated that he was next door. The door was closed. I waited from 10:25 to 10:30 a.m. The same student then went next door and told Mr. Henry that someone wanted him. Mr. Henry came back in his classroom and told me he had only been gone a few seconds, this was not true because I had been in his classroom for at least five minutes. Students are

to be supervised at all times but certainly anytime students are using machinery or welding, we must have a teacher in the classroom! There is absolutely no excuse for Mr. Henry to leave students unattended. Students are never to be left unsupervised for any reason because of liability reasons and the safety concerns of our students. This is especially important in vocational areas where students could be serious injured. Please visit with Mr. Henry about this very serious safety issue immediately.

Carter and Proehl both spoke to plaintiff about this safety concern.

After plaintiff's return on April 18, 2001, Carter asked plaintiff to help prepare the Plan of Assistance discussed on December 22, 2000, and prepared a draft of issues to assist plaintiff. On or about May 7, 2001, Carter met with plaintiff and gave him a list of issues to be addressed in the Plan of Assistance. One issue concerned how plaintiff would deal with situations when his hearing aids were not working or illness caused his inability to use the hearing aids. The list expanded the issues to be included in the Plan of Assistance. It also included inventory control and promptness. Given the fact that the list kept growing, plaintiff contacted Tucker who advised plaintiff not to respond any longer.

Plaintiff prepared a response dated May 7, 2001, in which he said since Carter was asking how he would handle times when he had a problem with hearing aids this suggested his past practice of taking sick leave, going to the doctor or having his hearing aid technician visit him at the school classroom were apparently perceived as insufficient. So plaintiff stated he required an aide as an accommodation. Carter did not perceive plaintiff's past practices as insufficient. Carter believed timely sick leave for medical emergencies was appropriate and just wanted to under-

stand plaintiff's future plans for emergencies. Carter did not communicate this perception to plaintiff. No medical emergencies have occurred since this time, either with plaintiff's ears or his hearing aids, to cause plaintiff to call the District administration or principal's office for an adult aide.

Carter edited plaintiff's draft response, and plaintiff and Carter discussed the draft on May 11, 2001. Carter noted on May 25, 2001 he asked plaintiff about finishing the Plan, but plaintiff said his lawyer had advised him not to finish it. Carter believed plaintiff's lawyer advised him to cooperate in the Plan of Assistance and prepared to discipline plaintiff for refusing to complete the Plan. Benson advised Carter not to do so.

Some of plaintiff's students appeared to be using the excuse of forgetting to wear suitable clothing for welding to avoid participating in plaintiff's welding classes and then causing discipline problems. The District purchased welding coats to help plaintiff with this problem.

On June 8, 2001, the District received plaintiff's disability discrimination Complaint filed with the Kansas Human Rights Commission (KHRC) and Equal Employment Opportunity Commission (EEOC). The alleged unlawful discrimination checked on the Complaint form is "DISABILITY." "Retaliation" is not checked, and the Complaint was never amended to allege retaliation. Markham represented the District before the KHRC.

On June 14, 2001, Tucker wrote Markham regarding outstanding issues to be addressed at a meeting on June 18, 2001, including plaintiff's objection to preparing his Plan of Improvement. Tucker stated that the Negotiated Agreement said that a teacher must be rated "Unsatisfactory" to be put on a Plan of Assistance, but the Evaluation form only had ratings of "Unacceptable" and "Needs Improvement," so

plaintiff had no rating of "Unsatisfactory." Tucker demanded the requirement be removed. In the same letter, Tucker demanded the sick leave charged for the period of January 02, 2001 through January 17, 2001 must be paid administrative leave. Tucker further claimed plaintiff was demoted and lost compensation by the District's hiring of another automotive teacher and removing his duties of VICA sponsor and department chair. He demanded plaintiff "be reinstated to the same teaching duties and position and supplemental assignments and pay as he had prior to January 1, 2001." Tucker also complained plaintiff was severely reprimanded by two of his superiors for being out of the classroom washing his hands. Tucker claimed plaintiff was wrongfully denied use of the District's facilities for LCC classes and demanded plaintiff be allowed use of the facilities for the fall semester and, finally, he claimed plaintiff was being harassed and treated rudely.

Markham replied to Tucker on July 24 2001, explaining a Plan of Assistance was discussed by Mr. Carter and Mr. Henry in December 2000, citing the District Policy, Teacher Evaluation Process, page 32, which provided: "in the event a teacher is rated as needs improvement or unacceptable in any one category on a formal evaluation, the teacher and principal shall work together using the process developed for job targets to attempt to raise the teacher's level of performance before the next formal evaluation." Markham acknowledged a discrepancy between the wording in the Paragraph 5081(5) of the Negotiated Agreement and the evaluation form, which had not been noticed before, but was being corrected. Markham stated "it is clear that a 'needs improvement' score on an evaluation automatically requires a 'job targets' or Plan of Assistance for a teacher." Markham explained if plaintiff failed to follow Board policies, "his noncoopera-

tion with Mr. Carter will be deemed to be insubordination and could result in formal disciplinary action up to and including termination." Markham's letter also stated the date of plaintiff's sick leave could be determined after response to other issues. Markham denied the allegation plaintiff was "demoted" when his supplemental contract duties were removed, because plaintiff "is on (or should be on) a Plan of Assistance.... These positions are generally given to teachers who have evaluations with no 'needs improvement' or unacceptable ratings.... The rationale is if a teacher is struggling in the classroom, the Board will limit his supplemental duties or other responsibilities that could take away from the primary (base) contract." In his letter, Markham also stated after plaintiff returned to work, he did not "fully cooperate with the Administration" and recited a list of examples from Carter's notes, including failure to make certain school visits, using students to load his personal belongings, and refusing to complete the Plan of Assistance. Markham addressed the denial of facilities explaining "the policy of the District is to not allow teachers who are struggling in their own classrooms, to take on secondary employment during the school year that detracts from their primary teaching duties with the District."

Plaintiff did not comply with the Board's policy asking him not to take on secondary employment with LCC and taught for LCC in fall 2001 and the following semester using other facilities including his own home shop.

On August 2, 2001, attorney David Calvert wrote the District he was also representing the plaintiff, that plaintiff had requested an aide as a reasonable accommodation due to the "noise level inherent in [his] courses," was denied an aide, and requested assurance that a classroom aide would be provided. Markham re-

plied for the District on August 16, 2001 and requested a call to discuss the issue. Benson had not understood any prior communication from plaintiff or Tucker to request a "classroom aide." In the past, plaintiff asked for some assistance from a "para." A para (paraprofessional) accompanies a designated disabled student(s) and is paid by TriCounty Special Education Cooperative, but a classroom aide would be paid by the District.

On August 21 2001, Carter gave plaintiff a memo setting up a meeting on August 23, 2001, which would also include Benson and Hill. The purpose of the meeting was to discuss plaintiff's request for a classroom aide made through Calvert. Plaintiff was asked to bring a written request for an aide and his rationale of need. He was also asked to bring his Plan of Assistance and the comments requested in May 2001 for his annual evaluation.

On or about August 22 2001, plaintiff provided the request for a classroom aide. Plaintiff responded:

I am hearing impaired. Even with the use of two hearing aids, I have a significant loss of hearing. You have received my audiological tests and their interpretation by Ruth Osborne. In any environment other than perfect silence, my hearing loss is significant. Your plan of assistance, dated May 7, asked that I tell you how I plan to deal with situations where hearings are not working or illness causes inability to use hearing aids. I infer from that request, that you perceive I have a problem in that area. That speaks to the need for an aide if those situations arise, since one of these situations will eventually arise. In the past, I have taken sick leave, or gone to the doctor or hearing aid technician after school, or asked that my hearing aid technician visit me at school. Since those actions are evidently perceived by

the administration as insufficient, I require an aide when those situations arise. Your item 5, supervision of students from bell to bell, involves situations that routinely arise resulting from difficulty hearing what students are doing behind by [sic] back, especially in the noisy environment of a welding shop class. I experience difficulty when helping one student with a welding project, which necessitates my wearing a welding helmet. The hearing aids will not overcome the muffling that the helmet creates, and feedback is also a problem. Supervision of the other students is difficult, and an additional person in the classroom is required. Item 6 of the May 7 plan of assistance mentions discipline policy and class structure. I would remind you that you have received written reports from me on three other welding schools in the area, relating their discipline policy and class structure. Those discipline policies are quite stringent and require that I know what is being said and done behind my back and out of my hearing. I require an aide for that purpose. I believe that an aide is a reasonable accommodation that would greatly assist me in coping with the difficulties I experience resulting from my disability.

Benson, Carter, Hill, plaintiff and Tucker met on or about August 23, 2001 to discuss plaintiff's request for a classroom aide as an accommodation. Plaintiff complained he could not hear well with his hearing aids when wearing a welding helmet and welding, although this was not the only complaint concerning plaintiff's hearing and need for an aide. Benson believed that a normal hearing teacher who was welding while wearing a helmet would be unable to hear students, but would still be responsible to keep an eye on the classroom and supervise the students. Benson did not believe plaintiff had any different problem with this aspect of welding class-

room supervision than a teacher with normal hearing. Plaintiff, like any teacher, could request adult help from the Principal's office in the event of illness (or a problem with his cars or hearing aids), but these sorts of emergencies can be covered by the Administrative staff as they arise, and in Benson's opinion did not justify the expense of hiring a classroom aid to be available full time. A full time classroom aide for plaintiff would have cost the District approximately $15,000 per year in salary, plus benefits.

In the meeting on August 23, 2001, the parties also discussed other accommodations, and the District agreed to provide a shop bell, flashing light and a separate phone line in the shop, and did so. Plaintiff suggested a part time aide could be a student with training, but Benson rejected that idea as unsafe. In the August 23, 2001 meeting, plaintiff presented a grievance letter to Principal Carter listing three grievances: 1. the requirement of a Plan of Improvement; 2. demotion in violation of 5081(9) based on removal of supplemental contracts; and 3. denial of use of facilities for LCC classes. The three occurrences dated back to the January 15 Memo.

The grievance process requires a filing with the principal (Level I), appeal to the Assistant Superintendent or Superintendent (Level II) and appeal to the Board of Education (Level III). The grievance was denied by Carter on August 29, 2001, as untimely based on Policy 5082.04, requiring all grievances to be filed within 30 days after an occurrence.

Tucker wrote Carter on September 4, 2001 regarding the denial of the grievance, stating Tucker's prior letters to Markham raised the issues and made the grievances timely. There was no Level II or Level III appeal.

Benson reported to the Board on the August 23, 2001 meeting with plaintiff and

his attorney by Confidential Memo of August 24, 2001, regarding plaintiff's request for a classroom aide, and said he would request a meeting with Tucker and Markham to explore the possibility of settlement for an aide, and that he, LaForge and Simmons were recommending an aide. The settlement meeting never happened.

Instead, the Board chose to refer the plaintiff's matter (including the aide issue) to outside counsel at the Kansas Association of School Boards (KASB) for review. Benson and Carter went to Topeka to see KASB attorney Cynthia Kelly on September 4, 2001. The School Board "is obligated to make provisions for and safeguard funds which will enable the schools to be operated in accordance with the state school laws." On September 10, 2001, Kelly provided an opinion letter by fax on pending issues with plaintiff. It included a review of District decisions on plaintiff's medical leave, the Plan of Assistance, the District's denial of supplemental contracts for department chair and VICA, plaintiff's discrimination claim, insubordination if plaintiff continued to resist job targets or a Plan of Assistance, and the issue of plaintiff's request for a classroom aide. Kelly did not recommend providing a classroom aide to plaintiff. Based on Kelly's opinion letter and report, the District did not provide a classroom aide to plaintiff.

On October 3, 2001, plaintiff's job targets/Plan of Assistance was completed. It was signed on October 9, 2001. Plaintiff's Plan of Assistance required the preparation of daily lesson plans, supervision of students at all times in the shop, and maintaining an inventory of school purchased supplies to be used in an appropriate manner, with observation by the Principal two to three times per week.

On October 10, 2001, the KHRC found No Probable Cause for plaintiff's allegations of disability discrimination. Plaintiff did not file a Petition for rehearing with the KHRC.

On October 12, 2001, the District ordered welding curtains for plaintiff's classroom at a cost of $7,511.02. The welding curtains do not seal or soundproof the welding booths for persons with normal hearing. They do soundproof the welding booths for plaintiff. When plaintiff is working in a booth with a student he cannot hear what is going on in the welding shop.

On November 7, 2001, the Parsons Fire Department inspected the Parsons High School. Among other matters noted, the fire inspector found that the exits were blocked in the weld shop, and the school was generally criticized for excessive accumulation of trash and debris. When Carter prepared plaintiff's evaluation two months later, he criticized the lack of cleanliness of the welding shop.

On October 16, 2001, Calvert wrote to the District's attorney stating "you have not responded to his request for a classroom aide. In order for him to comply as much as possible with your requested 'plan of improvement,' he needs that aide." Calvert wrote Markham again ten days later regarding the back order on a speaker for plaintiff's classroom and reiterated the request for a classroom aide. Markham wrote Calvert on November 8, 2001, responding that the speaker had been installed and asked for the reason for the request for a classroom aide. Calvert responded by letter of November 13, 2001, to Markham stating that the noise level of the class required a classroom aide. Calvert's letter did not suggest that the noise level had changed since plaintiff's audiologist released him for work without accommodations in spring 2001, or that plaintiff's hearing had changed. Calvert's letter does state, "an interactive process must

take place between the school District and Mr. Henry, not between counsel for both."

Benson, Hill and Carter met with plaintiff on November 30, 2001, to discuss plaintiff's request for an aide. Plaintiff believed the meeting would be only with Carter. In the meeting, plaintiff asked to get Calvert on the phone, but Benson declined because he understood Calvert's letter of November 13, 2001, to mean that the interactive process meeting should be between District representatives and plaintiff without attorneys.

During the meeting the following topics were discussed. Benson stated when plaintiff returned to work in April 2001, his doctors noted plaintiff was fine to return to work and no mention of accommodations was made at that time. Plaintiff responded that the hearing aids pick up loud noises and drown out the human voice and that they cut off when they receive really loud noises, making it very difficult to hear to what students say and difficult to know what is going on behind his back. He tried to explain to Benson hearing aids are a help and not a cure for deafness, that they are not perfect especially with his hearing loss. Plaintiff said his hearing aid audiologist is amazed that he hears as well as he does. He also told Benson, Hill and Carter that it is very stressful not to know what is being said or what is going on. Benson talked about the fact that plaintiff had come to Benson the prior year about the problems he was having at that time, how he could not conduct his duties because of his hearing problems. Carter also made the point that plaintiff had not lost his job because he had not lost any wages plaintiff responding that was due to his attorney's intervention. Plaintiff told Carter he went to Carter about his problems, seeking help, but instead he lost his job. Carter denied that plaintiff lost his job. When plaintiff returned to work, however, he was replaced in his auto shop duties and was stripped of his departmental chairmanship, VICA sponsorship, and was not allowed to teach the LCC classes. There was a great deal of discussion about how the shop classes were running and that plaintiff had no students failing this year. Plaintiff said he had better student material this year compared to the previous year. Plaintiff told Benson, Hill and Carter because they were not deaf, they had no idea what it is like to try to hear and understand, that they didn't know what he went through in an extremely noisy environment. Plaintiff stated his hearing tests were under controlled circumstances. Benson's response was repeated many times, because his doctors certified plaintiff as able to return to work in April Benson did not see that plaintiff needed any accommodations.

As a result of plaintiff's complaint in the meeting of problems hearing the intercom, Carter asked maintenance to have the welding shop phone connected to the Intercom. Markham wrote Calvert on December 10, 2001, an interactive meeting had been held, but Calvert replied that the meeting was not an "interactive process."

On or about November 20, 2001, plaintiff provided Carter with a letter from plaintiff's audiologist Ruth Osborne. The letter stated:

You recently informed me that your work environment has changed and the area is considerably noisier than your former environment. I understand that you are having some communication difficulties and may need some assistance or environmental adjustments. I am offering the following recommendations in order to help alleviate these problems and assure your continued success as teacher.

1. A teacher's aid or assistant would be helpful in your most populated classes.

2. An environmental assessment should be conducted to identify problem areas.

3. An alerting system, perhaps a flashing light, might be connected to the intercom system.

I believe implementation of these recommendations would be helpful in your present job situation and would also be beneficial to your students.

Dr. Osborne's letter did not suggest there had been any change in plaintiff's hearing ability since she tested him on March 22, 2001, nine months earlier, and released him for work without any accommodations required. Her letter did state an aide or assistant would be helpful.

The amplified phone with flashing light which plaintiff requested, together with a private line was provided before July 2001. Plaintiff worked for over a year since the fall of 2000 in the same work environment. Carter, Hill and Benson were not aware of any "change" in the room that could have made the area noisier. Furthermore, in the new High School shop, plaintiff had a separate classroom closed off from shop noise. However, plaintiff told the defendant's agents that the noise in the shop prevented him from adequately hearing what was going on as early as December 22, 2000. Carter and Benson were not aware of any change in the shop environment that would require an environmental assessment or an aide for plaintiff.

On January 14, 2002, Carter asked plaintiff in a memo in response to the Osborne letter, "please provide in writing a detailed description as to how your work environment has changed since the first semester of last year. This will better help me understand your need for an aide." Plaintiff replied to Carter by memo of January 16, 2002. Plaintiff's memo of January 16, 2002, did not describe any change in the welding shop environment he had worked in since fall 2000, or his hearing ability. Plaintiff also gave Carter

a memo on the same date explaining why he did not request an aide for LCC classes. The District did not provide an aide in response to these memos.

Carter had removed the Plan of Assistance at plaintiff's evaluation on January 10, 2002, because plaintiff's teaching performance on Plan issues showed improvement.

In 2002, the District decided to work toward having all of its vocational classes and instructors "vocationally certified," which requires certain testing. On February 12, 2002, Carter sent plaintiff a letter asking him to fill out a form to take a test to be vocationally certified, explaining that "we are working on moving all our vocational classes to the certification and would like all instructors to be vocationally certified." Plaintiff did not respond.

On or about April 1, 2002, Principal Carter gave plaintiff a memo asking him for the following items: 1) a complete and accurate inventory, because the one turned in was timely but not complete or accurate; 2) copies of student project drawings requested nearly two months earlier on February 12, 2002; and 3) an answer key to plaintiff's safety test. Prior to April 1, 2002, plaintiff turned in his inventory as he had every year. As usual, he did not include items under $100. Carter asked plaintiff to include every item including textbooks which normally are inventoried in May at the end of the school year. All teachers were asked to update their inventories annually but, they were not asked to do this until the end of the school year. Carter instructed plaintiff to re-do the inventory, because Carter was aware of purchases of items for the welding shop which plaintiff forgot to include on the inventory.

Plaintiff replied to Carter by memo of April 7, 2002, that he does a rough draft of student drawings due to their inexperience and provided samples. Plaintiff provided

Carter a copy of his welding "true-false" safety test on which he wrote at the top of the first page, "all answers are true. JH" Carter did not think a test with all answers true was a very good true-false test. However, there is a certain academic freedom in giving tests and plaintiff determined with all answers being "true," the students could keep it as a guide.

On or about April 6, 2002, plaintiff asked to be reinstated as department chairperson for the vocational department, with a copy of the request to Calvert. Carter replied on April 10, 2002, the position was filled and plaintiff could apply if the position became open in the future.

On about April 9, 2002, Carter visited plaintiff in plaintiff's classroom and told him that from that point on, since plaintiff insisted on getting lawyers and the union involved, all contacts would be "formal." Carter said he did not approve of plaintiff's teaching methods, did not like his safety test, and if Carter chose to do so, he would put plaintiff back on a Plan of Assistance. Carter said it was his decision and this happened because plaintiff was involving KNEA and his lawyers in his contacts with Carter. Carter told him any time plaintiff wanted to know something, he should ask him face to face instead of involving the other parties.

Several months later, in a memo dated October 29, 2001, plaintiff was asked by District Vocational Coordinator Cherie Thomas to prepare the state competencies for the welding curriculum by February 1, 2002, but plaintiff had failed to do so by April 8, 2002. Plaintiff attempted to obtain assistance from Thomas but she was not available. Welding was added to plaintiff's teaching assignment so that Parsons High School could offer it. Plaintiff agreed to teach welding until a certified teacher could be found, but he has been teaching it since that time. His vocational certificate is in auto mechanics. The deadline for the state was approaching, and Thomas gave plaintiff until April 12, 2002, to prepare the competencies. Carter gave plaintiff time off to prepare the competencies. Plaintiff sought assistance from another school to complete their competencies.

On April 24, 2002, Cherie Thomas gave plaintiff a memo regarding portions of his submitted competencies which did not comply with KSDE guidelines and asked him to rewrite them by May 1. On April 22, 2002, Calvert had given written notice to the District pursuant to K.S.A. 12–105b, requesting monetary damages of $550,000.00. This lawsuit was filed on April 23, 2002.

In spring 2002, there had been questions concerning whether the District would lose federal funding for welding classes if plaintiff was not a state vocationally certified or approved welding instructor. Carter attempted to clarify the requirements and received some information by letter dated April 10, 2002, stating "vocationally approved programs such as welding, need vocationally approved welding instructors in order to maintain funding." Carter also received information from the Kansas State Department of Education, which said plaintiff needed to take a trade competency exam in welding. Earlier, Carter asked plaintiff to sign up for the test, but plaintiff had not done so. Since there was a deadline at hand for the test application, Carter signed plaintiff and another teacher up for the test. Later, he explained to the teachers why he signed their applications. Plaintiff did not go take the test.

On July 17, 2002, Proehl received a letter from the Kansas State Department of Education assuring the District that plaintiff's lack of vocational certification in welding would not affect funding. On July 18, 2002, Proehl sent a copy of the State letter to plaintiff, who asked to be assigned to teach automotive classes again. Proehl

told plaintiff there was no vacancy in the automotive program. She also told plaintiff based on the letter from the State, he could teach welding.

On September 27, 2002, Thomas and all of the District Vocational Instructors attended the KSDE in-service about the technical program review process. Thomas reported to that Carter plaintiff asked her three times to explain what a course outline was even though he had a copy of the format, and she explained to plaintiff four times he would need to write his course competencies. However, plaintiff had great difficulty hearing during the presentation. The technical review was a procedure completely new to plaintiff and to most of the teachers at the high school. When plaintiff requested help from Thomas, her response was always to direct him to the format. He needed more specific help dealing with the review but did not get it.

On September 30, 2002, Carter received a note about plaintiff from Thomas, which described a conversation in which plaintiff said he could not do the work for the Technical Program Review of the Welding Department. On November 11, 2002, Principal Carter received a note dated November 7, 2002, from Thomas, which recounted two incidents: first, plaintiff had asked Thomas to stay after school on October 31, 2002, regarding the Technical Program Review preparations. He failed to show up or call. Second on November 7, 2002, plaintiff asked to meet with her during his 4th hour planning period but did not show up or call. When Thomas spoke to plaintiff, he had no recollection of setting up either meeting.

Plaintiff believes he did not make an after-school appointment with Thomas, although he did make one visit to her room for help. When plaintiff visited Thomas for help, she handed the book of instructions regarding the Technical Program Review. She did not give him any specific guidance. He submitted his materials to Thomas several times and each time Thomas returned the materials to plaintiff, saying they were wrong.

In fall 2002, Carter understood that state inspectors had criticized a large welding shop grinder due to lack of safety shields. Plaintiff spoke with a safety inspector about the need for safety guards on the grinders. The inspector told him safety guards are not required any more, so long as the students wear safety glasses. The inspector did not cite the lack of safety guards as a violation and did not write the school up for that condition. All students use either a safety shield or safety glasses, when operating grinding equipment.

On October 21, 2002, Principal Carter wrote a memo to plaintiff telling him to order and attach safety shields to the large grinder to prevent student injury. Plaintiff had rigged up some homemade shields but Carter did not believe they were adequate. Carter was concerned even if students wore eye protection while grinding, students' faces or other parts of the body could still be injured by flying sparks and metal. Carter observed plaintiff ignored Carter's safety requirements and continued to leave students welding unattended by an adult.

On October 18, 2002, Principal Carter sent plaintiff a memo with safety and performance concerns which included Carter's observation on "other occasions I have stood in your room for up to 20 minutes while students weld and you are not present. I will start documenting every time I see students welding while you are not in your shop." Carter had talked to plaintiff about not leaving students unattended while welding at the December 22, 2000 meeting, and Proehl had criticized plaintiff for the same thing in May 2001. Plaintiff

notes he sometimes spends twenty minutes with a student in the welding booth until the student can perform a weld. When Carter observed plaintiff's class, he stood in the corner of the room. It is sometimes necessary for plaintiff to take one student to the classroom. Plaintiff does not think it is reasonable to ask the other students to stop welding, in order to take them into the classroom also.

Carter's memo of November 18, 2002, also stated in part: "3) Safety—I asked you to order guards for your grinders. You have installed old face shields that are not safe. Please order new guards that meet all safety requirements and install them as soon as possible." Plaintiff responded in writing on November 20, 2002, and said he did not know where to get face shields for the grinders. Carter supplied plaintiff with information from a catalog on where to order the face shields.

On November 18, 2002, the same day Carter had expressed concerns with plaintiff's performance and safety issues, plaintiff's doctor issued a note limited plaintiff's standing to six hours per day. Plaintiff had undergone a back surgery and had been under sitting and standing limitations since August 6, 2002. Plaintiff was told he could have a chair in the welding shop. The limits on plaintiff's ability to stand continued through June 2003.

Plaintiff resumed teaching for LCC in fall 2001 off campus and in spring 2002 in the District facilities. In December 2002, plaintiff asked Carter if he could use the District welding shop to teach an additional class for LCC. Carter discussed the request with new Superintendent Deborah Perbeck. Benson had retired after the spring 2002 semester. Perbeck and Carter felt with plaintiff working under doctor's restrictions and with the performance issues documented in November, 2002, plaintiff should be focusing on his primary job of teaching District students. In January 2003, they declined to allow plaintiff to use the shop for additional LCC classes intending he not add to his outside work load.

On or about December 12, 2002, Principal Carter made notes from a meeting planned for December 10, 2002, but held on December 12, 2002. Carter noted he tried to meet with plaintiff on December 10, 2002, during plaintiff's planning time but plaintiff refused to meet without an NEA union representative. Carter needed the meeting with plaintiff to review materials for the vocational review with Thomas. Carter's notes of the meeting on December 12, 2002, and subsequent work on the vocational materials, state:

> We did meet on the 12th during 4th hour Sue Maples, Cherie Thomas, Jerry Henry, and myself were present. Cherie spent the entire hour trying to show Jerry where we needed to make changes. Jerry repeatedly stated that this was confusing since welding was not his trade field. Jerry also stated that he did not understand concepts such as integration of science, math, and reading into his teaching of welding. Finally Jerry stated that he did not understand what classroom based learning was. Jerry had received a half day training on this earlier in the fall and had been given a template to follow that had not been followed. Jerry had also failed to take any of the time during school when subs were provided to work on this. Jerry was told to take Thursday and Monday to work on the material and Cherrie [sic] would be available to help. Thursday he worked at school with Cherie and Monday he worked at home which is not what was planned he was to work at school where Cherie was available to answer questions.

Eventually plaintiff worked with an instructor at Coffeyville, who supplied him

with competencies. Plaintiff adapted these competencies to reflect the teaching at the high school.

On January 16, 2003, Proehl wrote plaintiff a letter denying his request for funding to attend a conference, stating in part:

Your request to attend the Connecting Education and Employment Conference has been denied because of lack of funding. No money was appropriated last fall when you said you did not want to attend the conference. Cherie Thomas has indicated that you have since changed your mind and want to attend in order to receive in-service points.

The letter goes on to explain what plaintiff needed to do to renew his vocational certification in auto mechanics. About six months earlier, in June 2002, Cherie Thomas, Vocational Coordinator, had sent plaintiff a note about what he needed to do to renew his automotive certificate, including that a conference would have to be added to the budget.

Carter completed an application for plaintiff to take the NOCTI welding examination to be given at the spring VICA conference. Plaintiff did not voluntarily sign up for the welding examination. Carter signed the application for the test. Plaintiff was not aware he was supposed to take the test until he received a bill for it. Plaintiff was required to take the test despite statements of the defendant to Tony White that the exam was not necessary for plaintiff to maintain his employment nor was it a requirement of his state certification to teach welding. On or about April 30, 2003, plaintiff and the District were notified plaintiff had not successfully completed either the written or performance components of the NOCTI welding examination given on April 2, 3 and 4. Plaintiff's NOCTI scores included a mark in safety lower than the Group, Site, State or National scores. Plaintiff's total score on the NOCTI/VICA welding test was 115 out of 450.

On May 7, 2003, plaintiff's wife sent Proehl an e-mail asking whether plaintiff could take another welding test, the CWE test in Kansas City in the summer. Plaintiff believed intensive teaching and instruction preceded the CWE welding test. Proehl responded by e-mail to plaintiff:

The CWE test in Kansas City is a more difficult test and also more expensive than the Trade Competency Examination you took in Wichita in April. Since you have not successfully competed [sic] the written or performance components of the Trade competency Examination, the District will not pay for you to take the CWE test in Kansas City this summer.

Carter left the District to become Superintendent at the Herington Public Schools. Plaintiff is not sure whether Carter terminated voluntarily or involuntarily. Carter issued a reprimand on June 17, 2003 to plaintiff based on Carter's understanding that plaintiff repeatedly failed to install new protective safety equipment on grinders in the welding shop, first requested by Carter on October 21, 2002, and again on November 18, 2002.[3] Carter also issued a letter on June 17, 2003 to plaintiff with a copy to new High School Principal Ted Hill, recommending plaintiff be put on an intensive Plan of Assistance for two reasons: 1) concerns about safety, primarily plaintiff's failure to obtain and install new grinder safety shields; and 2) plaintiff's failure on the NOCTI welding test raising questions about plaintiff's ability to teaching welding.

Plaintiff's union representative Tony White appealed the letters to Perbeck.

---

**3.** The contents of this reprimand are uncontroverted. It remains to be established whether plaintiff actually repeatedly failed to install the equipment.

Perbeck decided Hill and his new Assistant Principal Marty Anderson could observe plaintiff's work in the fall and make a decision themselves about whether a plan of improvement was warranted and what steps to take under the Negotiated Agreement. She told White she would remove Carter's reprimand and letter from plaintiff's file. Perbeck removed the two letters by Carter dated June 17, 2003 and destroyed them, so there is no record of them in plaintiff's personnel file at the District.

Carter visited the plaintiff's room two to three times a week as specified during the Plan of Assistance in late 2001, and continued those visits periodically through spring 2003, because he still had safety concerns with plaintiff's teaching performance. Plaintiff believes Carter continued to visit his room to harass him. Carter states he visited plaintiff's room with the same frequency he visited any teacher's room if he had performance concerns. Carter and Hill could not say from their observations of plaintiff that he required a classroom aide to be able to teach adequately.

Carter states when plaintiff insisted on having a union representative present every time they talked, Carter told plaintiff that he was going to have to document the meetings. Carter states his discussions and recommendations for a Plan of Assistance were not related to plaintiff's request for union representation or his hearing impairment, but due to plaintiff's neglect of safety issues, competency issues and failure to complete various work assignments on time.

Plaintiff believes the District took away his Supplemental Contracts in 2000, revoked his permission to teach LCC classes at the high school and put him on a Plan of Assistance to punish him for not taking disability. He believes this is the reason the District required him to see health care providers and Osborne.

On June 24, 2003, plaintiff visited with Proehl about how to renew his auto mechanics certification. At that time, he checked to see if the grinder guards had been ordered. Plaintiff had filed the purchase order with the high school office; he had a copy of it with him. Plaintiff asked Carter in early 2003 to get someone to repair the vents on the welders. As of the end of the school year, they were not repaired. The maintenance department told him they had not yet received a work order. Plaintiff was seeking confirmation Carter passed the purchase order on to the District office. Carter wrote plaintiff a letter dated June 17, 2003 accusing plaintiff of not ordering the guard. Proehl checked and the guards were ordered. The grinder guards were installed pursuant to plaintiff's signed "Request for Maintenance/Repairs" in August 2003.

On July 7, 2003, plaintiff had an audiogram performed by his hearing aid provider, Miller. Miller wrote a report which stated plaintiff's ability to hear speech and understand people will change from day to day or week to week with this type of hearing loss. Miller stated he believed plaintiff hears better than one would expect for one with his amount of hearing loss. He said the hearing aids plaintiff has are the best ones for his type of loss. Miller stated he did all he could do for plaintiff.

A request for plaintiff to use the District's facilities for September LCC classes in Small Gas Engines and Hobby Welding, made August 7, 2003, was approved by Hill on August 20, 2003. A request for plaintiff to use District's facilities for October LCC classes in Small Gas Engines and Hobby Welding, made September 8, 2003, was approved by Hill on September 10, 2003.

Plaintiff continues to teach for both LCC and the District without an aide, except for paraprofessionals who regularly accompany certain special education students. During 2001, 2002, and 2003, plaintiff has not asked his U.S.D. # 503 students to present their questions in writing because of his hearing impairment.

During this timeperiod, plaintiff was not absent during the school hours he was scheduled to teach. He attended three out-of-county school districts at Carter's direction (Columbus High School, Labette County High School, Coffeyville Industrial), observing their welding programs and facilities. He wrote reports on all three schools covering their grading system, their safety rules and their policies. The reports were written at home on his own time.

District policy 5081, part 6., states:

As per KSA 72–9004, consideration should be given to the following personal qualities and attributes during teacher evaluations. Efficiency, personal qualities, professional deportment, ability, results and performance, including in the case of teachers the capacity to maintain control of pupils or students, and such other matters as may be deemed material.

## II. Standard

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgments as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the opposing party. *Jurasek v. Utah State Hosp.*, 158 F.3d 506, 510 (10th Cir. 1998). The party moving for summary judgment must demonstrate its entitle-

ment to summary judgment beyond a reasonable doubt. *Baker v. Board of Regents*, 991 F.2d 628, 630 (10th Cir.1993). The moving party need not disprove the non-moving party's claim or defense; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

The party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party must present significant admissible probative evidence supporting that party's allegations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. Analysis

### A. Status of plaintiff's claim of discrimination under the ADA (count I)

Plaintiff's first claim alleges defendant discriminated against him in violation of § 12112(a). The ADA prohibits discrimination of a "qualified individual with a disability" because of the individual's disability with respect to the terms, conditions, and privileges of employment. *See* 42 U.S.C. § 12112(a). To establish a prima facie case under the ADA, plaintiff must demonstrate that (1) he is disabled within the meaning of the ADA; (2) he is qualified, i.e., with or without reasonable accommodation, he is able to perform the

essential functions of the job; and (3) defendant discriminated against him because of his disability. *Pack v. Kmart Corp.*, 166 F.3d 1300, 1302 (10th Cir.1999). If plaintiff establishes a prima facie case, the burden shifts to defendant to offer a legitimate, nondiscriminatory reason for its employment decision. *Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir.1995) (citations omitted). If defendant comes forward with a nondiscriminatory reason for its actions, the burden shifts back to plaintiff to show "a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief." *Id.*

██ The court will assume without deciding plaintiff is disabled within the meaning of the ADA. Thus, the court focuses its inquiry on the second element necessary to establish a prima facie case, i.e., is plaintiff with or without reasonable accommodations able to perform the essential functions of his job.

Defendant argues if plaintiff's description of the severity of his hearing loss is accurate then he cannot perform the essential functions of his job. In particular, defendant cites plaintiff's admission he has increasing difficulty maintaining effective classroom management and control. Pursuant to K.S.A. 72–9004 and defendant's policy, classroom management and control are essential functions of the job of a teacher. In order to be able to perform this essential function, plaintiff requests a full-time classroom aide as a reasonable accommodation. Plaintiff's rationale for this accommodation is that the aide will help with classroom supervision. Plaintiff states that in performing his job, he often

needs to talk on the phone, hear announcements on the intercom, communicate with students as a group and communicate with students one on one. Although the record does not reflect whether these tasks are essential functions of a teacher's job, the plaintiff seems to be presenting them as such. He also admits he has difficulty with each of these tasks. Presumably, plaintiff is requesting an aide to help with these tasks as well. Taken together, it seems clear that plaintiff believes a classroom aide is necessary in order for him to perform the essential functions of his job as a high school welding teacher.[4]

In *Jewell v. Blue Valley Unified School Dist. No. 229,* 210 F.Supp.2d 1241 (D.Kan. 2002), the court considered a similar request for a full-time paraprofessional to accommodate a teacher. Analyzing Tenth Circuit precedent, the court held the accommodation was not reasonable, stating:

> The courts of appeals have consistently held that employers are not required to assign existing employees or hire new employees to perform certain functions or duties of a disabled employee's job which the employee cannot perform by virtue of his or her disability.

*Id.* (citing *Merrell v. ICEE–USA Corp.,* 2000 WL 1854117 at \*3, 5 (10th Cir.2000); *Deal v. Candid Color Systems,* 1998 WL 381036 at \*3 (10th Cir.1998); *Milton v. Scrivner, Inc.,* 53 F.3d 1118, 1124 (10th Cir.1995); *Frazier v. Simmons,* 254 F.3d 1247, 1261 (10th Cir.2001)) (additional citations omitted). In response, plaintiff relies on *Borkowski v. Valley Central School District,* 63 F.3d 131 (2d Cir.1995) and *Nelson v. Thornburgh,* 567 F.Supp. 369 (E.D.Pa.1983). However, both of these

---

4. Whether plaintiff actually needs a classroom aide in order to perform the essential functions of his position seems to be in question. Defendant suggests plaintiff does not actually need this accommodation, but simply wants

this accommodation. However, the record seems clear that plaintiff, at least in his own mind, believes a classroom aide is necessary. *See* plaintiff's written rationale for an aide provided to Carter on or about 8–22–01.

cases present different situations from the case at hand. In *Borkowski*, the case could not be dismissed at the summary judgment stage because the record did not show whether classroom management was an essential function of a teacher's job. 63 F.3d at 141–42. Here, K.S.A. 72–9004 and defendant's policy show classroom management is an essential function. *Nelson* involved a group of blind social workers, each of whom used a reader for a specific task during one part of the day. 567 F.Supp. at 371–72. The social workers filed suit to force their employer to pay for the reader. *Id.* The case did not involve the hiring of a new employee to essentially assist one employee for the entire day. Finally, plaintiff presents no discussion of *Jewell* or any attempt to distinguish his case from relevant Tenth Circuit law.

Based on the aforementioned, the court finds plaintiff's request for a full-time classroom aide is not reasonable as a matter of law. Accordingly, the court concludes that plaintiff is not able to prove the necessary second element of his prima facie claim. The court grants summary judgment to the defendant with respect to count I.

### B. Status of plaintiff's claim of retaliation under the ADA (count II)

■ Plaintiff's second claim alleges defendant retaliated against plaintiff contrary to § 12203(a). Initially, the court notes that "in order to prosecute an ADA retaliation claim, a plaintiff need not show that [he] suffers from an actual disability. Instead, a reasonable, good faith belief that the statute has been violated suffices." *Selenke v. Medical Imaging of Colorado*, 248 F.3d 1249, 1264 (10th Cir.2001). In *Pastran v. K–Mart Corp.*, 210 F.3d 1201, 1205 (10th Cir.2000), the court provides the requirements for a prima facie claim of retaliation under § 12203(a). Plaintiff must show:

(1) he engaged in protected opposition to discrimination, (2) his employer subjected him to an adverse employment action subsequent to the protected activity, and (3) a causal connection exists between the protected activity and the adverse employment action.

*Id.* "Once plaintiff establishes a prima facie case, the burden of production shifts to defendant to articulate a legitimate, non-discriminatory reason for the adverse action." *Henderson v. International Union*, 263 F.Supp.2d 1245, 1286 (D.Kan.2003). If defendant presents such evidence, "plaintiff must then be allowed to demonstrate that the defendant's offered reasons are a mere pretext for discrimination." *Id.*

■ Before examining the merits of plaintiff's retaliation claim, it is necessary for the court to identify when plaintiff engaged in protected activity. On June 8, 2001, defendant received plaintiff's discrimination complaint filed with the KHRC and EEOC. By filing this claim, plaintiff engaged in protected activity. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir.1999) (citation omitted). The complaint alleged plaintiff experienced discrimination based on disability; it did not allege plaintiff experienced retaliation. Thus, any claims of retaliation based on events occurring before plaintiff filed his KHRC claim must be dismissed. Plaintiff failed to exhaust his administrative remedies with respect to those events. *Sheets v. CTS Wireless Components, Inc.*, 213 F.Supp.2d 1279, 1285 (D.N.M.2002). Incidents predating defendant's receipt of plaintiff's claim also lack a casual connection between the protected activity and the alleged adverse action. Accordingly, plaintiff's claim of retaliation must be based on incidents occurring on and after June 8, 2001.

■ In plaintiff's briefing, he focuses on two incidents as the "clearest evidence" of

retaliation. Plaintiff cites Carter's comments, made on April 9, 2002, concerning his disapproval of plaintiff's teaching methods and safety test. At this time, Carter also discussed putting plaintiff back on a Plan of Assistance. Carter additionally said any contacts with plaintiff would need to be "formal," as plaintiff involved the KNEA and lawyers in their dealings. Second, plaintiff points to Carter's June 17, 2003 reprimand recommending plaintiff be placed on an intensive Plan of Assistance. Carter cited safety concerns and plaintiff's performance on the NOCTI welding test as the reasons underlying his recommendation.

 As discussed above, plaintiff engaged in protected activity by filing his complaint with the KHRC and EEOC. Next, plaintiff is required to show some adverse action taken by the defendant. 1 F.3d at 1128. Considering only the two incidents cited, plaintiff fails to make this showing. Carter's comments and his discussion with plaintiff do not rise to the level of adverse action. "Incidents in which [plaintiff] was merely counseled or issued a notice or written reprimand ... are simply too inconsequential to constitute actionable adverse actions." 263 F.Supp.2d at 1284. Furthermore, "increased tension and unpleasant relationships between employees are not considered actionable adverse actions." *Id.* (citations omitted). Carter's June 17, 2003 reprimand also fails to establish an adverse employment action. The reprimand occurred almost two years after plaintiff filed his complaint with the KHRC. So, plaintiff cannot claim temporal proximity indicates the reprimand was an adverse employment action. 181 F.3d at 1179 ("The closer [the adverse action] occurred to the protected activity, the more likely it will support a showing of causation."). As the defendant did not act on this reprimand and removed it from plaintiff's file,

it also did not alter the terms and conditions of plaintiff's employment. Upon a review of plaintiff's other allegations of retaliation throughout the record, the court finds no actions taken by defendant after June 8, 2001, which rise to the level of an adverse employment action.

Based on the aforementioned, the court grants summary judgment to defendant with regards to plaintiff's count II.

## C. Status of plaintiff's claim for tortious interference with business relationship (count III)

 Plaintiff's third claim alleges defendant tortiously interfered with his LCC teaching contract. Plaintiff's claim is based on defendant's denials of its facilities for plaintiff's use. These denials occurred in January 2001 and January 2003, times plaintiff sought to use the high school shop to teach adult classes for LCC. Plaintiff argues that a genuine issue of material fact exists concerning whether defendant intended to harass him and force his resignation. Plaintiff asserts that the defendant's denials were part of its overall scheme of harassment. Defendant argues it acted properly alleging it was privileged and justified in making its decisions. The Kansas Supreme Court discussed tortious interference with a business relationship in *Turner v. Halliburton Co.*, 240 Kan. 1, 722 P.2d 1106 (1986). The *Turner* court recognizes "not all interference in present or future contractual relations is tortious. A person may be privileged or justified to interfere with contractual relations." *Id.* (citation omitted). "The question of privilege is one of law to be determined by the court." *Brown Mackie College v. Graham*, 768 F.Supp. 1457, 1460 (D.Kan.1991). "In the terms of the Restatement [Restatement (Second) of Torts § 767 (1977)], if the actions complained of were not improp-

er there is no ground for recovery." 240 Kan. at 14, 722 P.2d 1106. Determination of whether the defendant's actions were privileged and proper involves the consideration of several factors:

> (1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests of the other with which the actor's conduct interferes, (4) the interests sought to be advanced by the actor, (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (6) the proximity or remoteness of the actor's conduct to the interference, and (7) the relations between the parties.

*Id.*

Considering the seven *Turner* factors, the court finds the defendant's denial of its facilities to be privileged and proper. Defendant's Negotiated Agreement and Policies governing secondary employment states "secondary employment must not interfere with the quality of work expected of the employee." This agreement permits defendant to restrict secondary employment. Under the circumstances, the court finds defendant was justified in deciding plaintiff's secondary employment might interfere with the quality of his work. Defendant's denial in January 2001 occurred in the midst of questions about plaintiff's ability to teach defendant's students adequately and during the period he was on the Plan of Assistance. Defendant's denial in January 2003 occurred following plaintiff's medical restrictions on standing and Carter's performance criticisms of plaintiff. Based on the Negotiated Agreement and Policies, defendant was justified in denying plaintiff use of its facilities in connection with his secondary employment. Accordingly, the court grants summary judgment to defendant with regards to plaintiff's count III.

### D. Status of plaintiff's KAAD claim (count IV)

 Plaintiff also brings a claim of discrimination under the KAAD (count IV). Defendant argues this claim should be dismissed, because the plaintiff failed to exhaust his administrative remedies before bringing suit. If a plaintiff fails to exhaust administrative remedies before filing suit under the KAAD, the court lacks subject matter jurisdiction over the claim. *Leeker v. Gill Studios, Inc.* 21 F.Supp.2d 1267, 1273 (D.Kan.1998) (citation omitted). Relevant to plaintiff's KAAD claim, K.S.A. 44–1010 states, "no cause of action accrues until a petition for reconsideration is at least filed with the administrative agency." On October 10, 2001, the KHRC found there was no probable cause for plaintiff's allegations of disability discrimination. Plaintiff did not file a petition for rehearing with the KHRC before filing this lawsuit. The court also notes plaintiff fails to address this issue or offer any evidence he did exhaust his administrative remedies. Accordingly, the court finds it lacks subject matter jurisdiction over plaintiff's KAAD claim and defendant is entitled to summary judgment with respect to plaintiff's count IV.

IT IS THEREFORE ORDERED this 29th day of July, 2004 that the court grants the defendant's motion for summary judgment (Dkt. No. 47). Accordingly, the court dismisses the claims against defendant.